1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF NEW MEXICO

3      ALYSSA CARTON,

4                       Plaintiff,

5         vs.                              CV-17-0037 KG/SCY

6      CARROLL VENTURES, INC.,

7                       Defendant.

8

9

10                    TRANSCRIPT OF PROCEEDINGS
                         STATUS CONFERENCE
11           BEFORE THE HONORABLE KAREN B. MOLZEN
             CHIEF UNITED STATES MAGISTRATE JUDGE
12            THURSDAY, MAY 11, 2017, 10:02 A.M.
                    ALBUQUERQUE, NEW MEXICO
13

14

15     FOR THE PLAINTIFF:

16         LAW OFFICE OF SHARON E. POMERANZ
           Attorney at Law
17         143 Pine Street
           Santa Fe, New Mexico  87501
18         BY:  SHARON E. POMERANZ

19

20     Reported by:

21         JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
           United States Court Reporter
22         333 Lomas Boulevard, Northwest
           Albuquerque, New Mexico  87102
23         Phone:  (505)348-2209
           Fax:  (505)348-2315
24         Email:  Julie_Goehl@nmcourt.fed.us

25

```
 1                       I N D E X

 2                 THURSDAY, MAY 11, 2017

 3                                                   PAGE

 4    QUESTIONS BY THE COURT                          11

 5    QUESTIONS BY MS. INDAHL                         31

 6    QUESTIONS BY MR. REID                          122

 7    QUESTIONS BY MS. INDAHL                        126

 8    QUESTIONS BY MR. RIEDER                        128

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
FEDERAL OFFICIAL COURT REPORTER
333 Lomas Boulevard, Northwest
Albuquerque, New Mexico  87102

```
 1                      STATUS CONFERENCE

 2               (Court in session at 10:02 a.m.)

 3             LAW CLERK JEFFRIE MINIER:  All rise.

 4             THE COURT:  Good morning.  Please be seated.

 5             We're here in the matter of Alyssa Carton v.

 6    Carroll Ventures, Inc., in Civil Cause 17-37 KG/SCY and

 7    those other cases that have been listed and have been

 8    joined for the purposes of this hearing.

 9             Counsel, if you would introduce yourself,

10    please, and enter your appearance.

11             MS. SHARON POMERANZ:  Yes.  Sharon Pomeranz

12    representing Alyssa Carton.

13             THE COURT:  I think we're all going to need to

14    speak up, if we could.  Ms. Carton, thank you for being

15    here today.

16             MS. ALYSSA CARTON:  Thank you for allowing me

17    another opportunity to come.

18             THE COURT:  I'm glad to have you here.  I see I

19    have three attorneys at counsel table.

20             MS. ANNA INDAHL:  Good morning, Your Honor.

21    Should I come to the podium for my appearance?

22             THE COURT:  No, I think we can hear you all

23    right.

24             MS. ANNA INDAHL:  Okay.  I'm sort of coming

25    down to the microphone.
```

1          Anna Indahl on behalf of Carroll Ventures.  Do

2     you want me to list the CV numbers, the full clients?

3          THE COURT:  If you would.

4          MS. ANNA INDAHL:  Okay.  And that's CV-0037.

5     And B+H Investments, LLC, which is CV-00153.  Westland

6     Properties, LLC, which is CV-00084.  And M & E New Mexico

7     Property, LLC, which is 00161.

8          THE COURT:  All right.  Thank you.

9          MR. SPENCER REID:  Your Honor, Spencer Reid

10    with the Keleher firm here on behalf of New Mexico Bank &

11    Trust, CV-00164.

12         THE COURT:  Thank you.

13         MR. GEOFFREY RIEDER:  Your Honor, if the Court

14    please.  I'm Geoff Rieder.  I'm here today on behalf of

15    the Sedberrys, who are defendants in Case 00160.  They're

16    in the courtroom.

17         THE COURT:  And you'll need to speak up for me,

18    please, or get closer to the microphone.  There we go.

19         MR. GEOFFREY RIEDER:  Okay.  Did you hear any

20    of it?

21         THE COURT:  Now I can hear you.

22         MR. GEOFFREY RIEDER:  Okay.  So, the Sedberrys,

23    and they're here.  00160 is their cause number.  And then

24    3801 Eubank, which is Cause Number 00301.

25         THE COURT:  All right.  And I believe I have

1    some attorneys on the telephone, as well.  If you want to

2    please give your name and identify yourself.

3              MR. REPPS STANFORD:  This is Repps Stanford

4    from Moody & Warner on behalf of Three J's, Limited

5    Partnership.  The cause of action is 17-CV-00173.

6              THE COURT:  Thank you.

7              MR. MARK RHODES:  This is Mark Rhodes.  I

8    represent Johanna James and Frederick Yost.  The cause of

9    action is CV-00304 LF/CG.

10             THE COURT:  Any other attorneys on the phone?

11             MR. STEPHEN HAMILTON:  Yes.  Yes, Your Honor.

12   Stephen Hamilton, Montgomery & Andrews.  I'm appearing on

13   behalf of Kawips, New Mexico, LLC, and that is Cause

14   Number CV-00159.

15             MS. SANDRA BROWN:  Your Honor, Sandra Brown

16   appearing for Miller Family Real Estate in Cause Number

17   00075.

18             THE COURT:  Anyone else?  Unless you're

19   speaking, for those folks on the phone, would you please

20   put your phone on mute so that we don't get any feedback.

21             Any other attorneys on the phone who have not

22   entered an appearance?

23             MR. MARTIN ORLICK:  Yes, Your Honor.  May it

24   please the Court.  My name is Martin Orlick, O-R-L-I-C-K,

25   of the law firm of Jeffer, Mangels, Butler & Mitchell in

1    San Francisco.  I represent Cole MT Albuquerque, which is

2    CV-00038.  I also am appearing specially on behalf of

3    Cole AB Albuquerque, and that is 00063.  And finally, I'm

4    appearing specially on behalf of Wells Fargo Bank in

5    00229.

6              THE COURT:  All right.  I'm assuming there are

7    no further entries of appearance by telephone.

8              It looks like we have a lot of folks out there

9    in the audience, as well.  Do any of the attorneys out in

10   the audience want to make an appearance?  And if so, I

11   think you could just tell me who you -- I do need you to

12   come forward to the microphone, but let's shorten this

13   up, if we could.  If you'd just give me your name and the

14   case number.

15             MR. WINTER LAITE:  Winter Laite, Carton v.

16   Petty, 0085.

17             THE COURT:  Thank you.

18             MS. LORNA WIGGINS:  Lorna Wiggins in matters

19   00048 and 00223.

20             THE COURT:  Thank you.

21             MS. THERESA PARRISH:  Theresa Parrish, 00295.

22             MR. AARON VIETS:  Aaron Viets, 00298.

23             MS. JILL COLLINS:  Jill Collins, 00220; 00069;

24   00060; 00296; and finally, 00213.

25             THE COURT:  Thank you.

 1              MR. BENJAMIN DECKER:  Benjamin Decker, 00082

 2      and 00083.

 3              THE COURT:  Thank you.

 4              MS. GINA DOWNES:  Gina Downes in matters 00222

 5      and 00297.

 6              THE COURT:  Thank you.

 7              MS. BARBARA STEPHENSON:  Barbara Stephenson,

 8      00309.

 9              THE COURT:  Thank you.

10              MS. ERIKA ANDERSON:  Erika Anderson on behalf

11      of Holiday Bowl, Case Number 158.

12              MS. TIFFANY ROACH MARTIN:  Tiffany Roach Martin

13      on behalf of Zia Trust, Inc., 000085.

14              MR. NATHAN NIEMAN:  Nathan Nieman on behalf of

15      U.S. Bank National Association, 00315.

16              MR. THOMAS DAWE:  Good morning, Your Honor.

17      Tom Dawe on 00228.

18              MR. MARK GLENN:  Good morning, Your Honor.

19      Mark Glenn on 00154 and 00156.

20              MS. CASSANDRA MALONE:  Good morning.  Cassandra

21      Malone on behalf of HDY LLC, 00040.

22              MR. JOHN ZIEGLER:  Good morning.  John Ziegler

23      on behalf of 227.

24              MR. JAMES CHAVEZ:  Good morning, Your Honor.

25      James Chavez on 303 and 311.

1          MS. MONICA GARCIA:  Good morning, Your Honor.

2     Monica Garcia, Butt Thornton & Baehr.  I'm here for 294

3     and 78.

4          MS. AGNES F. PADILLA:  Good morning, Your

5     Honor.  Agnes F. Padilla for 59, 211, 215, and 218.

6          MR. MARK JARMIE:  Good morning, Your Honor.

7     Mark Jarmie appearing in Case 310.

8          THE COURT:  Thank you.

9          MR. BILL CHAPPELL:  Your Honor, Bill Chappell

10    appearing in Case 00305.

11         THE COURT:  Did you hear that, Julie?

12         THE COURT REPORTER:  Would you say the case

13    number again, please.

14         THE COURT:  Would you say the case number

15    again, please.

16         MR. BILL CHAPPELL:  00305.

17         THE COURT:  All right.  Thank you.  Anybody

18    else on the telephone?

19         All right.  We're here today.  This is a

20    continuation of a prior hearing.  I found that I really

21    needed to hear from Ms. Carton in this case.

22         Ms. Carton, if you would just speak into the

23    microphone for me.

24         MS. ALYSSA CARTON:  Sure.

25         THE COURT:  I do want to place you under oath

JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
FEDERAL OFFICIAL COURT REPORTER
333 Lomas Boulevard, Northwest
Albuquerque, New Mexico  87102

```
 1        at this time, so if you'd raise your right hand.
 2                    MS. ALYSSA CARTON:  Oh, okay.  Thank you.
 3                    THE COURT:  Actually, right hand.
 4                    MS. ALYSSA CARTON:  Sorry.
 5                    THE COURT:  There you go.  Do you solemnly
 6        swear that your testimony today in court will be the
 7        truth, the whole truth, and nothing but the truth?
 8                    MS. ALYSSA CARTON:  Yes, ma'am.
 9                    THE COURT:  All right.  And you don't need to
10        worry; I think that's picking you up just fine.
11                    MS. ALYSSA CARTON:  Oh, okay.  Yeah.  I've
12        never done this before.  But thank you.
13                    THE COURT:  All right.
14                    MS. ALYSSA CARTON:  I have a written statement
15        on my mother's laptop that I would like to read.
16                    THE COURT:  That would be fine.
17                    MS. ALYSSA CARTON:  Okay.  Thank you.
18                    My apologies to the Court for missing the last
19        hearing.  I wasn't ready when the bus showed up, so I
20        canceled the service.
21                    However, I texted my attorney that the bus had
22        broken down, because I panicked and I didn't know what to
23        say.  I had a brain lapse.  I was doing something, and
24        then I forgot what I was doing.
25                    So she called me after receiving my text, and I
```

1    told her I wasn't going to make it to court, and asked

2    her to dismiss my cases.

3              I have experienced barriers to -- I have

4    experienced barriers to access at many public places

5    throughout my life.  I did experience barriers as

6    identified by the ADA at each location I filed a suit

7    against.  Originally, I decided to file ADA suits to be

8    an advocate for myself.

9              THE COURT:  Can you slow down just a bit?

10             MS. ALYSSA CARTON:  Sure.

11             THE COURT:  There you go.

12             MS. ALYSSA CARTON:  Originally, I decided to

13   file ADA suits to be an advocate for myself and other

14   people with disabilities, but the stress and bad

15   publicity, the hate mail, and other risks to my health

16   are too problematic and overwhelming for me.

17             I did retain Ms. Pomeranz to represent me.  I

18   met Ms. Pomeranz through an ad on Craigslist.  We met at

19   my house to discuss the ad and the barriers I faced.

20   Ms. Pomeranz contacted a Litigation Management Company.

21   We all kind of met and --

22             THE COURT:  I'm sorry.  I couldn't hear you.

23             MS. ALYSSA CARTON:  Sorry about that.  We all

24   met and discussed --

25             THE COURT:  I'm sorry.  Could you give me the

1    sentence before that?

2              MS. ALYSSA CARTON:  Oh, let me go back.  I

3    said, we met at my house, me and Ms. Pomeranz, and as

4    well as the team of people that she's working -- was

5    working with, to file all these cases.

6              I reported all the monies I received.  Let's

7    see here.  I can't scroll down.  Okay.

8              I reported all the monies I received from the

9    Litigation Management Company to the Court.  Ms. Pomeranz

10   and I received litigation support and funding from the

11   Litigation Management Company, which I stated earlier.

12             I do not wish to take up more of the Court's

13   time or more resources, so I would ask to dismiss any

14   remaining cases.

15             In the future, I will use dispute resolution if

16   I encounter a barrier to access.

17             I just want to make it clear, I do not work for

18   AID.

19             And, yeah, that's pretty much all I need to

20   say.

21             THE COURT:  All right.  I do have questions for

22   you, and I'm sure that some of the folks over here will

23   have questions, as well.

24             MS. ALYSSA CARTON:  Yes.  Thank you.

25             THE COURT:  So tell me about this Craigslist.

1    Tell me how you first found out about this.

2                MS. ALYSSA CARTON:  Well, you know, like I

3    said, I was online, looking for something to do, and I

4    was interested in advocacy on some level.  I have friends

5    that I talk to about advocacy issues all the time and

6    things like that.  And so it wasn't, you know -- what is

7    the word I want to use?  It's not uncommon for me to want

8    to go out and find things to do to benefit my community

9    of people with disabilities.  I did that.  And, you know,

10   I was --

11               THE COURT:  Tell me about this ad on

12   Craigslist.  What did it say?

13               MS. ALYSSA CARTON:  I don't remember the

14   specifics of the ad, but it was just basically saying,

15   you know, are you interested in making a change?  You

16   know, call this number or whatever.  And it led me to

17   Ms. Pomeranz, in a nutshell.

18               THE COURT:  Okay.  So was Ms. Pomeranz's phone

19   number on that ad?

20               MS. ALYSSA CARTON:  No, it was somebody else's.

21   It was the team of people that she was working with.  I

22   don't remember if it was -- well, no, it was the

23   secretary.  I think it was something like that.  It was a

24   secretary.  And then it could have been a cellphone or

25   something like that, as far as I know.  And then they

1    were saying, you know, they represent her, work with her,

2    but they just wanted to be available for someone like me

3    if I wanted to pursue ADA compliance.

4             THE COURT:  And did it indicate any kind of

5    financial incentive?

6             MS. ALYSSA CARTON:  No, I don't think so.

7    Well, I mean, it did indicate that, you know, if

8    settlements happened, you know, that I would receive

9    funds from something like that, you know.  I mean, it's

10   just kind of obvious if you go and you sue somebody and,

11   you know, disputes happen or whatever, there's a

12   settlement.  This is something I kind of took with a

13   grain of salt, you know, to be part of the deal.

14            THE COURT:  All right.  And did you enter into

15   a contract?

16            MS. ALYSSA CARTON:  Yes, I did.

17            THE COURT:  And who was that contract with?

18            MS. ALYSSA CARTON:  Ms. Pomeranz.

19            THE COURT:  All right.  And did you -- you made

20   reference to being paid a certain amount per case that

21   was filed?

22            MS. ALYSSA CARTON:  Well, I reported the monies

23   to the Court and things like that, but I think I might

24   have just threw that out there, you know, when I was

25   confronted with the news and things like that.  People

```
1   were kind of attacking me about making money, and I was

2   just like, well, I'll just try to make something up.

3              THE COURT:  Well, I'm just trying to find out

4   what the facts are.

5              MS. ALYSSA CARTON:  Yeah.  No, I totally

6   appreciate where you're coming from.  And that's what I

7   did.  I just made something up because people were

8   attacking me, and I just thought, well, try and give them

9   what they want.  It didn't really help, though.

10             THE COURT:  Did anyone pay you for filing a

11  lawsuit?  Any organization?  Did anybody pay you?

12             MS. ALYSSA CARTON:  Did anybody pay me for --

13             THE COURT:  For filing a lawsuit?

14             MS. ALYSSA CARTON:  It seems like I got money

15  from settlements, you know, but that's all I'm aware of.

16             THE COURT:  Okay.  Because you know --

17             MS. ALYSSA CARTON:  We have an affidavit, if

18  you'd like to see the affidavit.

19             THE COURT:  Well, I've got you here, so I'd

20  rather just ask you questions at this point.  And of

21  course I'll look at the affidavit.

22             MS. ALYSSA CARTON:  Okay.  I wasn't sure --

23             MS. SHARON POMERANZ:  She's referring to

24  something that was filed with the Court, that's part of

25  the record.
```

1            MS. ALYSSA CARTON:  Yeah.

2            THE COURT:  Oh, the IFP applications?

3            MS. SHARON POMERANZ:  Yes.

4            THE COURT:  Okay.

5            MS. SHARON POMERANZ:  She had updated any

6    monies that she received from litigation expenses to the

7    Court.

8            THE COURT:  Okay.

9            MS. SHARON POMERANZ:  It's under seal, though,

10   so I'm not going to say the amount.

11           THE COURT:  All right.  It's my understanding

12   that you indicated to someone that you were being paid

13   $50 per case.  Is that true?

14           MS. ALYSSA CARTON:  I don't know.  I don't know

15   if I did or not.  I mean, I was at a point in time where

16   I was just kind of talking to a lot of the different

17   people, so...

18           THE COURT:  But I'm asking you:  Were you paid

19   $50 per case?

20           MS. ALYSSA CARTON:  No.

21           THE COURT:  Okay.  The contract that you have

22   with Ms. Pomeranz, that is what you're referring to as

23   part of settlement proceeds that you anticipated getting?

24           MS. ALYSSA CARTON:  I guess so.  Right?

25           THE COURT:  Well, I'm asking you.

```
1              MS. ALYSSA CARTON:  Yeah.  Yeah.

2              THE COURT:  Okay.  And, indeed, there have been

3     some settlement monies that you have received in these

4     cases?

5              MS. ALYSSA CARTON:  Yes.

6              THE COURT:  You did apply for in forma

7     pauperis.  And what was your understanding of in forma

8     pauperis?

9              MS. ALYSSA CARTON:  I don't think I understood

10    in forma pauperis.  Honestly, I don't think I understood

11    it very well.  I mean, at this point I'm just going to

12    have to deal with the fact that that was filed, so...

13             THE COURT:  Well, I'm here on the in forma

14    pauperis statute.  That's Section 1915.  And you did fill

15    out those applications in each case, correct?

16             MS. ALYSSA CARTON:  Yeah, that was probably --

17    I think that was a while ago, which is why I probably

18    don't remember it very well.  But, yeah, I'm pretty sure

19    I filled that out.  Yeah.

20             THE COURT:  I want to make sure that you know

21    and that everyone here knows what in forma pauperis

22    means.  That application, once approved, allowed you to

23    avoid pre-payment of the fees.  There is a mandatory $400

24    fee.

25             MS. ALYSSA CARTON:  Uh-huh.
```

```
 1                  THE COURT:  $350 of that is a filing fee, and
 2       $50 is an administrative fee.
 3                  MS. ALYSSA CARTON:  Oh, okay.
 4                  THE COURT:  So for each case, there's a total
 5       of $400 filing fee that is mandatory.
 6                  MS. ALYSSA CARTON:  Uh-huh.
 7                  THE COURT:  When you applied for in forma
 8       pauperis treatment and that was approved, that meant that
 9       you were -- that the Court agreed to waive the
10       pre-payment of those fees.
11                  MS. ALYSSA CARTON:  Uh-huh.  Okay.
12                  THE COURT:  You nevertheless remain obligated
13       to pay those $400 per case.
14                  MS. ALYSSA CARTON:  Okay.
15                  THE COURT:  So right now, that would be --
16       let's see.  For the total of those cases, that's $39,600
17       that you're obligated to pay.
18                  MS. ALYSSA CARTON:  Okay.
19                  THE COURT:  Now, you have made payments --
20                  MS. ALYSSA CARTON:  Yeah.
21                  THE COURT:  -- towards that filing fee.
22                  MS. ALYSSA CARTON:  Yes.
23                  THE COURT:  And I don't think those are under
24       seal, are they, Ms. Pomeranz?
25                  MS. SHARON POMERANZ:  I don't think so, no.
```

```
 1              THE COURT:  I have you paying $400 on March

 2     3rd; $50 on March 3rd; $350 on March 23rd; $100 on March

 3     23rd; and $400 on April 10th.  Have you made any other

 4     payments?

 5              MS. ALYSSA CARTON:  I don't think so.  I'm not

 6     sure, though.  I'd have to look at my records.  I hadn't

 7     -- yeah.

 8              THE COURT:  And I believe there was about

 9     $5,000 in increased income that you indicated on one of

10     your updated status.

11              MS. ALYSSA CARTON:  Yes.

12              THE COURT:  What was the source of that income?

13              MS. ALYSSA CARTON:  I think the cases.  I -- I

14     don't remember the conversation with the person that

15     helped me file the situation.  I'm sorry, I just -- I

16     don't know how to answer that.

17              THE COURT:  All right.  So you have filed these

18     cases.  What was your understanding of your duties when

19     you agreed to do this for that?

20              MS. ALYSSA CARTON:  Well, I agreed to be -- to

21     go to locations that I would go to and believe would help

22     advocate for people with other disabilities like mine.  I

23     agreed, I believe, to be a tester in some of the

24     situations.  And just some of them, I just flat-out have

25     been a customer of, and so it just didn't seem -- you
```

1    know, that was kind of a separate situation, where I

2    filed just as a regular person.

3              THE COURT:  Okay.  So in each of these cases,

4    there's a paragraph indicating that you went to these

5    businesses --

6              MS. ALYSSA CARTON:  Uh-huh.

7              THE COURT:  -- intending to take advantage of

8    goods and services at that location.

9              MS. ALYSSA CARTON:  Yes.

10             THE COURT:  Each of these locations?

11             MS. ALYSSA CARTON:  Yes.

12             THE COURT:  Let me ask you about a few of

13    these.

14             MS. ALYSSA CARTON:  Sure.

15             THE COURT:  How about Quality Jeep?  Did you

16    intend to buy a Jeep?

17             MS. ALYSSA CARTON:  I think I was interested in

18    making that available to other people with disabilities.

19    I was more interested in, you know, the fact that -- I

20    think it was a tester situation, where I went over there.

21    I don't have the money to buy a new car, so that's

22    something that wasn't personal to me.

23             But I have -- you know, later on I would be

24    able to do that if I -- you know, if -- I wasn't sure if

25    that fit in that category, to do that layer-on, if I had

1      more of an income.  So it was kind of a sketchy

2      situation, and I think I realize that at this point in

3      time.

4                  THE COURT:  In each of these lawsuits --

5                  MS. ALYSSA CARTON:  Yes.

6                  THE COURT:  -- you made two separate

7      allegations; one that you were going as a customer --

8                  MS. ALYSSA CARTON:  Uh-huh.

9                  THE COURT:  -- and also that you were going

10     there as a tester.  So with regard to Quality Jeep, you

11     were only there as a tester?

12                 MS. ALYSSA CARTON:  Yeah, I was only there as a

13     tester.  I wasn't there as a...

14                 THE COURT:  And so that paragraph about being a

15     customer, that's untrue?

16                 MS. ALYSSA CARTON:  Yeah, that's untrue.  I was

17     never there as a customer.  I was there as a tester.

18                 THE COURT:  Is that also the case with visiting

19     the day care center?

20                 MS. ALYSSA CARTON:  Yeah.

21                 THE COURT:  All right.  And how about -- I

22     believe it's a business called 9613.  It's a men's

23     barbershop.  Did you go there as a tester?

24                 MS. ALYSSA CARTON:  I don't remember that.  I

25     don't remember the location of that one.  Because I live

1      near a barbershop.

2                  THE COURT:  Okay.

3                  MS. ALYSSA CARTON:  And so if that one's the

4      one near like Wyoming and Constitution, I want to say --

5      I don't know if it's Constitution or not.  But I do live

6      near a barbershop, and I do receive -- I do get my hair

7      cut at a barbershop.  I'm not sure if it's that one, but

8      -- so it's possible.

9                  THE COURT:  But the allegation as to that

10     barbershop, at the previous hearing, the attorney

11     indicated that you went there on a Monday, according to

12     your --

13                 MS. ALYSSA CARTON:  Okay.

14                 THE COURT:  -- complaint, and that it was

15     closed that day.

16                 MS. ALYSSA CARTON:  Right.

17                 THE COURT:  Do you recall that?

18                 MS. ALYSSA CARTON:  I think I do.  I think I

19     do, yes.  I went out that day, wanting to get a haircut,

20     and they were closed, so we left and just came back

21     another day, and then maybe filed the paperwork

22     inappropriately or something like that.  I don't think it

23     was malicious or anything like that.  We just weren't

24     paying attention.

25                 THE COURT:  How about the U-Haul?  Were you

1    there for goods and services at the U-Haul?

2                MS. ALYSSA CARTON:  I was there, thinking at

3    that time that I might be selling my home and that I

4    might need boxes, and so, you know, both as a tester, I

5    believe, if I'm not mistaken, as well as a customer.

6                THE COURT:  Tell me about how you visited all

7    of these locations.  Tell me what you did.

8                MS. ALYSSA CARTON:  What do you mean?

9                THE COURT:  You had a driver?

10               MS. ALYSSA CARTON:  I did have someone helping

11   me get there, yes.

12               THE COURT:  Who was the driver?

13               MS. ALYSSA CARTON:  Do you want a name, or do

14   you just want -- yeah, you do want a name.  The name was

15   Craig.  Craig.  That's all I remember.

16               THE COURT:  All right.  And how did you get

17   that driver?

18               MS. ALYSSA CARTON:  It was part of her team of

19   people.

20               THE COURT:  The people from Litigation

21   Management Services?

22               MS. ALYSSA CARTON:  Yeah.  Whatever their name

23   is, yeah.

24               THE COURT:  All right.  And so did you actually

25   enter each of these businesses?

1          MS. ALYSSA CARTON:  I entered most of them.  I

2      think there is several that we -- that were just parking

3      lot situations that, you know, parking lot violations

4      that we filed.  And so most of them, yes, I would say I

5      was there in the building.  But there's several that we

6      just filed for the parking lot.

7          THE COURT:  So who was the woman who was doing

8      the measurements at the -- was it Office Depot?

9          MS. ALYSSA CARTON:  I don't know.  I mean,

10     there was a woman in the beginning, but she wasn't around

11     for very long.  I don't know.

12         THE COURT:  Was she a driver?

13         MS. ALYSSA CARTON:  She was.  Yeah, she was a

14     driver.  And we let her go because she was making me

15     uncomfortable, and she was making the people that we

16     were, you know, dealing with uncomfortable.  And so it

17     was like, I don't want her help because, you know, it

18     puts me in this situation.  I'm now in court because of

19     some of her behavior.  So we just -- we let her go.  Or

20     she let her go.

21         THE COURT:  Ms. Pomeranz?

22         MS. ALYSSA CARTON:  Yeah.

23         THE COURT:  All right.  So as I'm understanding

24     this, Ms. Pomeranz is the person who provided you with

25     the driver, or her team?

```
 1            MS. ALYSSA CARTON:  Yes.  Yes.

 2            THE COURT:  All right.  And did you actually

 3    take any of the measurements?

 4            MS. ALYSSA CARTON:  I think I took a few, but

 5    not a lot.

 6            THE COURT:  All right.  And did Ms. Pomeranz

 7    accompany you on these trips?

 8            MS. ALYSSA CARTON:  I think there might have

 9    been one or two.  I don't really remember.  I remember

10    being on the phone with her, as well, so it might have

11    been that we were on the phone.  But, yeah, that's all I

12    remember about that.

13            THE COURT:  All right.  Did she take any

14    measurements?

15            MS. ALYSSA CARTON:  No.

16            THE COURT:  Okay.  What was your intention with

17    regard to visiting these businesses in the future after

18    you had filed the lawsuits?

19            MS. ALYSSA CARTON:  Well, you know, some of

20    them, you know -- or maybe most of them, really, I would

21    be a customer, and at least let my friends and

22    acquaintances that are disabled know that, you know,

23    things are more accessible now and they're able to have

24    access to these locations.

25            THE COURT:  What about you, individually?
```

1          MS. ALYSSA CARTON:  I would benefit, as well.

2     I mean, it seemed like we would all benefit.

3          THE COURT:  So was your understanding that you

4     would just go to these businesses on one occasion and

5     find violations?

6          MS. ALYSSA CARTON:  I think I assumed that, you

7     know, I would find the violations on one visit or

8     something like that, but that, you know, just being a

9     general customer is a good thing, you know, and that I

10    would be able to tell people that I know that things are

11    being changed.

12         THE COURT:  I think you told me, though, that

13    as far as many of these businesses, you did not go there

14    based upon seeking services or goods --

15         MS. ALYSSA CARTON:  Well, sure.

16         THE COURT:  -- but rather, to serve as a

17    tester.

18         MS. ALYSSA CARTON:  Right.  I did say that.  I

19    assumed that at some point I might change my mind about

20    being a customer, and so that just kind of gave me room

21    in the future to just go there and be there.  I wasn't

22    sure what I would want out of that.

23         THE COURT:  Did you intend to visit each of

24    these locations in the future; I mean, actually go there

25    again?

```
 1                  MS. ALYSSA CARTON:  I think I did, yeah.

 2                  THE COURT:  As to how many?

 3                  MS. ALYSSA CARTON:  I don't know.  All of them

 4          or most of them.  I don't remember.

 5                  THE COURT:  And how often did you intend to go

 6          back?

 7                  MS. ALYSSA CARTON:  I didn't really have an

 8          estimate.  I didn't -- I didn't have a -- you know.

 9                  THE COURT:  Okay.

10                  MS. ALYSSA CARTON:  I just didn't decide on

11          that.  I just left it open.  So obviously, that doesn't

12          sound good, but...

13                  THE COURT:  But you didn't have like a

14          concrete --

15                  MS. ALYSSA CARTON:  I didn't have a concrete

16          plan.  No, I'm not -- I'm not like that, sometimes.

17                  THE COURT:  Okay.  Did you have contact with --

18          direct contact with the folks at Litigation Management,

19          other than the driver?

20                  MS. ALYSSA CARTON:  I talked to them a little

21          bit; not a lot.

22                  THE COURT:  Who did you speak to?

23                  MS. ALYSSA CARTON:  Craig, who -- yeah, he

24          works with her, and he's also the driver, so...

25                  THE COURT:  And then you mentioned a secretary
```

1    that you called?

2              MS. ALYSSA CARTON:  Yes.  I don't remember the

3    secretary's name.

4              THE COURT:  Okay.  But that was --

5              MS. ALYSSA CARTON:  Yeah.  There were multiple

6    people.  There was a few people that I talked to.

7              THE COURT:  Can you recall their names?

8              MS. ALYSSA CARTON:  Let's see.  My mind is

9    going blank.  Alex, I think, was one of the names.  I'm

10   not sure.  But that sounds familiar, Alex.

11             THE COURT:  Okay.  Were there any businesses

12   that you visited, that you were prevented from getting

13   into the building due to your disability?

14             MS. ALYSSA CARTON:  Yeah.  Yeah, I would say I

15   think one of the -- the nursery that was on the news,

16   Ms. Laflin's broadcast.  I wasn't able to go over there.

17             THE COURT:  And why?  What prevented you from

18   doing so?

19             MS. ALYSSA CARTON:  Well, the parking lot

20   didn't have, you know, handicap spaces; and, as well, the

21   gravel was difficult for me to go through.  But, you

22   know, if I'm going there, I'm going to have somebody help

23   me, you know, get there, get through the parking lot.

24             THE COURT:  How did you decide on the number of

25   lawsuits that you wanted to bring?

1              MS. ALYSSA CARTON:  I don't think I had a plan,

2       as far as that.  I'm so sorry that that affected all

3       these people, but I didn't really have a plan, so it was

4       just kind of the way it turned out.  It wasn't a concrete

5       plan.  I mean, obviously I went and I did it, and I have

6       to own that.  But I didn't intend to start out with, oh,

7       I want to do the entire city, or whatever.  You know what

8       I mean?  That wasn't my goal.

9              THE COURT:  Did you ever express any concern

10      that in bringing so many lawsuits, you were taking on

11      more than you should?

12             MS. ALYSSA CARTON:  I think I did at some

13      point, but I don't know if I -- I mean, I talked to my

14      personal friends about it, you know.  I was like, this

15      seems kind of like it could go in the wrong direction.

16      But I don't remember.  I think I might have told her, as

17      well, but that conversation is kind of out the window of

18      my mind right now.  I'm sorry.

19             THE COURT:  Did you consider requesting, if you

20      found a problem, directly talking with the businesses and

21      asking them to fix it prior to filing any lawsuits?

22             MS. ALYSSA CARTON:  Yeah, I did.  I did talk to

23      her team about that, and I think, you know, we just kind

24      of...

25             THE COURT:  Were you discouraged from doing

1      that?

2                  MS. ALYSSA CARTON:  I think I was.  I don't

3      remember how that conversation occurred, but I think, you

4      know, I either got confused or I was just trying to make

5      my point to the person I was talking to at the time, and

6      it just didn't come out in a concrete way.

7                  THE COURT:  So are you saying that you

8      indicated that you wanted to contact the businesses and

9      ask them to remediate prior to filing a lawsuit?

10                 MS. ALYSSA CARTON:  Yes.  Yes.  In fact, I

11     talked to the staff and assumed -- it sounded like there

12     was going to be a point where there were letters sent to

13     them so that they would know we were coming or something

14     like that, or what we felt, and that, you know, that was

15     going to be taken care of by the team of people that was

16     involved in it.  And that just didn't happen, you know.

17     I found out later it didn't happen, and so I was like,

18     wow, this is really -- this isn't nice, to go over there

19     and do that.  You know what I mean?

20                 But I still wasn't sure if these places had

21     somebody write a letter or not, so unfortunately, I found

22     out through the news that didn't happen.

23                 THE COURT:  All right.  So it wasn't your idea

24     to file the lawsuit first?

25                 MS. ALYSSA CARTON:  No, ma'am, it was not my

1    idea to file the lawsuit first.

2                  THE COURT:  What were you told about Litigation

3    Management Services?  Did they say anything to you about

4    who they were, what they are?

5                  MS. ALYSSA CARTON:  Not really.  I mean, they

6    just told me that they were there and available to help

7    me -- you know, provide litigation support.

8                  THE COURT:  So they are the ones who

9    specifically sent you to Ms. Pomeranz?

10                  MS. ALYSSA CARTON:  Yeah.  They were connected

11   with her, and they -- it all just came across like they

12   were part of the team.

13                  THE COURT:  All right.  And so you didn't

14   Google an attorney?  You were directed to Ms. Pomeranz by

15   that --

16                  MS. ALYSSA CARTON:  Yeah, by the ad.

17                  THE COURT:  Okay.  Let me look if I have any

18   other questions.

19                  MS. ALYSSA CARTON:  Thank you.

20                  THE COURT:  I think at this point, I'll see if

21   perhaps --

22                  MS. ALYSSA CARTON:  Sure.

23                  THE COURT:  -- the folks over here have any

24   questions.

25                  Ms. Indahl?

1           MS. ANNA INDAHL:  I do.  And as the Court

2      suggested, we tried to coordinate.  I don't know that we

3      got everybody's input so, you know, there may be other

4      people that would like to ask their own questions.

5           But if I could, I would like to ask Ms. Carton

6      some questions about --

7           THE COURT:  No, but I do want to tell you how

8      much I appreciate you all working together to come up

9      with just three folks to ask these questions, instead of

10     a parade of individuals coming forward.

11          All right.  Ms. Indahl?

12          MS. ANNA INDAHL:  Should I sit here, then, or

13     should I come to the podium?

14          THE COURT:  No, I think it's fine if you want

15     to just stay there where your materials are, but if you

16     could move the microphone closer to you.

17          MS. ANNA INDAHL:  Okay.  Thanks.

18          Good morning, Ms. Carton.

19          MS. ALYSSA CARTON:  Thank you for coming.

20          MS. ANNA INDAHL:  Of course.  Thank you for

21     coming.

22          I know you're not a lawyer and I know that

23     you -- I presume you haven't had any other experience as

24     a litigant; is that right?

25          MS. ALYSSA CARTON:  No, I haven't.

1              MS. ANNA INDAHL:  And I know you are being

2      asked a lot of questions that you may not have personal

3      knowledge of, but a lot of them, you do have personal

4      knowledge of, so I appreciate your being so forthright

5      and honest with us.

6              MS. ALYSSA CARTON:  Yes.

7              MS. ANNA INDAHL:  So you said to the Court

8      earlier that you were connected with Ms. Pomeranz through

9      the Craigslist article, right?

10             MS. ALYSSA CARTON:  Yes.

11             MS. ANNA INDAHL:  Had you known her or had any

12     contact with her prior to being connected to her through

13     Litigation Management Services?

14             MS. ALYSSA CARTON:  No.  No, I had never met

15     her before.

16             MS. ANNA INDAHL:  Okay.  And I filed some

17     materials with the Court yesterday.  And if it's okay

18     with the Court, I would like to show Ms. Carton one of

19     the exhibits that I filed?

20             THE COURT:  Yes.  Ms. Pomeranz, did you give

21     Ms. Carton a copy of that filing yesterday?

22             MS. SHARON POMERANZ:  No, I did not.

23             THE COURT:  All right.

24             MS. ANNA INDAHL:  What I'm referring to is

25     labeled as Exhibit N to that packet of materials that I

1    filed yesterday.  Does that ad look similar to the ad you

2    saw when you ultimately contacted Litigation Management

3    and were connected with Ms. Pomeranz?

4             MS. ALYSSA CARTON:  No, this does not look

5    familiar.

6             MS. ANNA INDAHL:  Okay.  Do you know who Sean

7    Conway is?

8             MS. ALYSSA CARTON:  No, I do not.

9             MS. ANNA INDAHL:  Have you ever heard of him?

10             MS. ALYSSA CARTON:  I might have, but I don't

11   remember where I would have heard about him.  I -- it

12   might have been through other situations, I mean, with --

13   or just, you know, reading.  I tend to read the news, and

14   I tend to read about what's going on in other states, so

15   I -- you know, if I've heard that name, I would have

16   heard it there, not through this situation.

17             MS. ANNA INDAHL:  What do you mean, reading

18   about things that have gone on in other states?  You mean

19   other ADA litigations?

20             MS. ALYSSA CARTON:  Yeah.  I mean, I'm part of

21   several spina bifida association groups online that are,

22   you know -- what do I want to say?  You know, they're

23   just sharing news about what's going on in their state.

24   And so, you know, out of hearing about what's going on,

25   you know, with these people that I know on these groups,

1    I read a lot of stuff and I hear a lot of information.

2              MS. ANNA INDAHL:  So would you be surprised to

3    know that he has been working on your cases?

4              MS. ALYSSA CARTON:  I would be surprised.

5              MS. ANNA INDAHL:  Okay.  What about Ashley

6    Iannacone?

7              MS. ALYSSA CARTON:  I've never heard that name.

8              MS. ANNA INDAHL:  Okay.  And if she had been

9    working on your cases with Ms. Pomeranz, would that be

10   news to you?

11             MS. ALYSSA CARTON:  Yeah.  I've never heard

12   that name so, yeah, that would -- I guess that wouldn't

13   surprise me.  I don't know what to say to that.  I've

14   never heard that name.

15             MS. ANNA INDAHL:  Okay.  Have you any

16   recollection of what the Craigslist ad that you responded

17   to said?

18             MS. ALYSSA CARTON:  At this point, no.  I kind

19   of -- it's a Craigslist ad, you know.  It wasn't

20   important to me at the time.

21             MS. ANNA INDAHL:  Do you remember when you saw

22   it?

23             MS. ALYSSA CARTON:  I want to say sometime

24   around August.  I don't know.  August, September, maybe.

25   I don't quite remember.  I'm sorry.

```
 1              MS. ANNA INDAHL:  And did you respond to it

 2      shortly after you saw it?  Do you recall?

 3              MS. ALYSSA CARTON:  I don't think so.  I think

 4      I -- I think I -- you know, it was just one of the --

 5      well, I don't really remember.  I might have.  I'm sorry.

 6      I just don't really remember the details.  I might have.

 7              MS. ANNA INDAHL:  Do you remember how long it

 8      took from the time you made contact with Litigation

 9      Management Services to the time you had retained

10      Ms. Pomeranz?

11              MS. ALYSSA CARTON:  No, I don't remember.

12              MS. ANNA INDAHL:  Do you have an idea whether

13      it was a day?  A week?  Months?

14              MS. ALYSSA CARTON:  It seemed more than a week

15      or two, yeah.

16              MS. ANNA INDAHL:  Okay.  And were there other

17      lawyers that you considered hiring?  Or were you just

18      given Ms. Pomeranz's name and retained her on everything?

19              MS. ALYSSA CARTON:  Yes, at that time that's

20      kind of what was going on.

21              THE COURT:  And can I ask a question?

22              MS. ANNA INDAHL:  Absolutely.

23              MS. ALYSSA CARTON:  Yes, ma'am.

24              THE COURT:  The first time that you contacted

25      the Craigslist person --
```

1         MS. ALYSSA CARTON:  Yeah.

2         THE COURT:  -- were you given Ms. Pomeranz's

3   name at that time?

4         MS. ALYSSA CARTON:  No.  I -- I kind of wanted

5   to figure out what they were up to.  I mean, it seemed

6   kind of different to go through Litigation Management

7   Company, so I was interested in kind of learning how that

8   worked.  And so I talked to them a little bit, and I was

9   like, okay.  So, you know, then they basically introduced

10  me to Ms. Pomeranz.

11        THE COURT:  So do you recall how long it was

12  from the time that you contacted the secretary at

13  Litigation Management until you were given Ms. Pomeranz's

14  name?

15        MS. ALYSSA CARTON:  No, I don't remember.  It

16  didn't seem like, I mean...

17        THE COURT:  And I'm not asking you to be

18  precise.

19        MS. ALYSSA CARTON:  Yeah.  I don't -- I'm

20  sorry, ma'am.  I don't remember.  It might have been a

21  week or two.  I don't remember.

22        THE COURT:  Okay.  I'm sorry for the

23  interruption.

24        MS. ANNA INDAHL:  Thank you.  So did Litigation

25  Management Services hire Ms. Pomeranz?

1          MS. ALYSSA CARTON:  I wouldn't know that

2    answer.  I -- my assumption is they all worked together.

3    So, you know, it seemed like -- I guess so.  I mean, but

4    I don't really remember how that -- yeah.  I mean, I just

5    -- it seemed like they all worked together, so --

6          MS. ANNA INDAHL:  What about --

7          MS. ALYSSA CARTON:  -- maybe she was like a

8    part of a list of like attorneys or something like that.

9    That's probably what I assumed at the time.

10          MS. ANNA INDAHL:  Okay.

11          MS. ALYSSA CARTON:  So go ahead.

12          MS. ANNA INDAHL:  What about AID?  Was there a

13    relationship with AID, that you're aware of, and

14    Ms. Pomeranz?

15          MS. ALYSSA CARTON:  With Ms. Pomeranz?  No.

16          MS. ANNA INDAHL:  What about with you and AID?

17    Is there a relationship there?

18          MS. ALYSSA CARTON:  I don't have any

19    relationship with AID, as far as I know.  I mean, yeah.

20    No, I don't have any relationship with AID.  I'm aware of

21    them, but that's about it.

22          MS. ANNA INDAHL:  What about a relationship

23    with Litigation Management Services and AID?

24          MS. ALYSSA CARTON:  I'm aware of them.

25          MS. ANNA INDAHL:  So --

```
 1                    THE COURT:  I'm not sure I understand the

 2       question.

 3                    MS. ALYSSA CARTON:  Yeah, I don't understand it

 4       either.

 5                    MS. ANNA INDAHL:  I'm wondering if AID and

 6       Litigation Management Services have any sort of formal

 7       relationship or informal relationship that you're aware

 8       of?

 9                    MS. SHARON POMERANZ:  Object as speculation.

10                    THE COURT:  If you know.

11                    MS. ANNA INDAHL:  If you know.

12                    MS. ALYSSA CARTON:  I don't really know for

13       sure what the context of that is.

14                    MS. ANNA INDAHL:  Do you know if AID was the

15       organization's name before it became Litigation

16       Management Services?

17                    MS. ALYSSA CARTON:  I don't think so, but I

18       could be wrong.

19                    MS. ANNA INDAHL:  What do you --

20                    MS. ALYSSA CARTON:  I never investigated that

21       for sure.

22                    MS. ANNA INDAHL:  What knowledge do you have

23       about the connection between those two organizations?

24                    MS. ALYSSA CARTON:  I don't -- I don't have any

25       solid knowledge.  No, I don't have any solid knowledge
```

1          about that.

2                    MS. ANNA INDAHL:  Well, any sort of knowledge.

3          What sort of knowledge do you have?

4                    MS. ALYSSA CARTON:  I mean, I think -- I mean,

5          it seems like what...

6                    MS. SHARON POMERANZ:  I think she's confused

7          about the question.

8                    THE COURT:  Do you have any knowledge?

9                    MS. ALYSSA CARTON:  I don't really have any

10         knowledge, no.

11                   MS. SHARON POMERANZ:  It has been asked and

12         answered, Judge.

13                   MS. ALYSSA CARTON:  What were you saying?

14                   MS. SHARON POMERANZ:  I was objecting as asked

15         and answered on several points.

16                   THE COURT:  No, I don't think that the question

17         -- that you understood the question.

18                   MS. ALYSSA CARTON:  Okay.

19                   THE COURT:  Are you aware of any information

20         that would connect Litigation Management Services to AID?

21                   MS. ALYSSA CARTON:  Information?  No, I don't

22         think so.

23                   THE COURT:  You're pausing when you say

24         "information."  Why is that?

25                   MS. ALYSSA CARTON:  I mean, I'd have to look at

1    my, you know, documents at home and see if there's

2    anything, any connection.  I don't think there is.  But,

3    you know, off the top of my head, I don't have anything

4    in my mind.

5                THE COURT:  All right.  Ms. Indahl?

6                MS. ANNA INDAHL:  What documents would you look

7    at, that would help you determine that?

8                MS. ALYSSA CARTON:  My agreement.  My signed

9    agreement that I made with the company that I'm working

10   with that is associated with Ms. Pomeranz.

11               MS. ANNA INDAHL:  And that's Litigation

12   Management Services?

13               MS. ALYSSA CARTON:  Whatever services, yeah.  I

14   mean, whatever litigation company it is, yes.

15               MS. ANNA INDAHL:  So you do have a signed

16   agreement with them?

17               MS. ALYSSA CARTON:  I do have a signed

18   agreement with a litigation company, yes.

19               MS. ANNA INDAHL:  What does the agreement say?

20               MS. ALYSSA CARTON:  I don't have the document

21   in front of me.  I don't know if you remember anything,

22   Sharon?

23               THE COURT:  You don't have it with you?

24               MS. ALYSSA CARTON:  No, ma'am, I don't have it

25   with me.

1          MS. SHARON POMERANZ:  I would say it's

2     confidential.

3          THE COURT:  Did it have to do with litigation

4     that you were going to file in this Court?

5          MS. ALYSSA CARTON:  Yes, it did.  I think it

6     did, yes.

7          THE COURT:  I would want to see that agreement.

8          MS. ALYSSA CARTON:  Okay.

9          THE COURT:  All right?  I would want to see

10    that.

11         MS. SHARON POMERANZ:  We would be happy to

12    submit it under seal because, as I said, those agreements

13    were confidential.

14         MS. ANNA INDAHL:  Your Honor, I would object to

15    sealing it because it obviously impacts all of the

16    defendants that are interested in attorneys' fees in this

17    case.

18         THE COURT:  Let me --

19         MS. SHARON POMERANZ:  I would be breaching the

20    agreement, because I agreed to keep the terms of it as

21    confidential IFP.

22         MS. ANNA INDAHL:  Well, we can turn to a

23    protective order, then.

24         MS. SHARON POMERANZ:  Well, I would be happy to

25    show it to the Court, but I'm concerned that I would be

1    in jeopardy if I breached the agreement.

2              THE COURT:  If it's pursuant to a court order,

3    I'm saying I want to see the agreement.

4              MS. ALYSSA CARTON:  Okay.

5              MS. SHARON POMERANZ:  I'm happy to submit it.

6              MS. ALYSSA CARTON:  That's fine.

7              THE COURT:  What was your understanding of the

8    agreement?

9              MS. ALYSSA CARTON:  Just that they would be

10   helping Ms. Pomeranz with these cases.

11             THE COURT:  Go on ahead.

12             MS. ANNA INDAHL:  Was there any provision for

13   any sort of payment to you in that contract?

14             MS. ALYSSA CARTON:  I believe I answered that

15   earlier.  I don't know if it did or not.

16             THE COURT:  If you could just answer her

17   question.

18             MS. ALYSSA CARTON:  Oh, okay.  Sorry.  You

19   know, it's part of the affidavit that, you know, any

20   settlement money that happened with this case is -- you

21   know, I would receive funds from that.

22             MS. ANNA INDAHL:  And that's the only provision

23   for any sort of payment that you would receive under that

24   contract?

25             MS. ALYSSA CARTON:  As far as I understood it,

1    yeah.

2            MS. ANNA INDAHL:  And was -- I know the Court

3    asked you earlier if there was any sort of arrangement

4    for payment per case.  I'm going to ask a different

5    question.  Was there any sort of arrangement for payment

6    for finding the violations?

7            MS. ALYSSA CARTON:  No, I don't think so.  No.

8            MS. ANNA INDAHL:  So your contract with

9    Litigation Management Services, if you're representing to

10   the Court and to me that there was no payment provision,

11   what did the contract say?

12           MS. ALYSSA CARTON:  I don't have the contract

13   in front of me.  I'm not able to respond to that

14   question.

15           MS. ANNA INDAHL:  Did you read the contract?

16           MS. ALYSSA CARTON:  Yeah.

17           MS. ANNA INDAHL:  Did you sign it?

18           MS. ALYSSA CARTON:  Several months ago.

19           MS. ANNA INDAHL:  Did you sign it?

20           MS. ALYSSA CARTON:  Yes, I did.

21           MS. ANNA INDAHL:  And you still do have a copy

22   of it?

23           MS. ALYSSA CARTON:  I do have a copy of it

24   somewhere in my house.

25           MS. ANNA INDAHL:  So when I'm saying payment

1    per litigation or payment per violation or payment per

2    test, I mean, you're representing that there's no payment

3    for any sort of activity that you would perform under

4    that contract; is that correct?

5              MS. ALYSSA CARTON:  That's what the contract

6    says.

7              THE COURT:  I have a question.  Did that

8    contract provide that Litigation Management Services

9    would pay your costs in bringing these lawsuits?

10             MS. ALYSSA CARTON:  I think that sounds

11   familiar.  I think we talked about that.  So, I mean, I

12   don't know if that answers the questions better than

13   before.  But, yeah, that does sound familiar.

14             MS. ANNA INDAHL:  So did you sign that contract

15   before you filed your first lawsuit?

16             MS. ALYSSA CARTON:  I think so.  Yes.  Yes, I

17   did.  Sorry.  That's kind of a no-brainer.  Yes, I did.

18             MS. ANNA INDAHL:  And did you submit that

19   information, that Litigation Management Services would

20   pay your costs, to the Court in your IFP application?

21             MS. ALYSSA CARTON:  Say that one more time.

22             MS. ANNA INDAHL:  All right.  Let me break it

23   down to a shorter question.  So you said that you believe

24   the contract with Litigation Management Services and

25   yourself provides that Litigation Management Services

```
1     would pay your costs; is that right?

2              MS. ALYSSA CARTON:  Yes.

3              MS. ANNA INDAHL:  And one of those costs would

4     be your filing fee, correct?

5              MS. ALYSSA CARTON:  Yes.

6              MS. ANNA INDAHL:  Did you disclose to the Court

7     that you had that arrangement when you applied for in

8     forma pauperis status when you filed your complaints?

9              MS. ALYSSA CARTON:  Yes.  I think I did.

10    Somebody did it for me.

11             MS. ANNA INDAHL:  Who did it for you?

12             MS. ALYSSA CARTON:  Her staff.

13             MS. ANNA INDAHL:  Who?

14             MS. ALYSSA CARTON:  Ms. Pomeranz's staff.

15             MS. ANNA INDAHL:  Who on the staff?

16             MS. ALYSSA CARTON:  I don't know.

17             MS. ANNA INDAHL:  Okay.  Are you aware that

18    your IFP form was submitted on the form for the District

19    of Colorado?

20             MS. ALYSSA CARTON:  No.

21             MS. ANNA INDAHL:  So did you review your IFP

22    application before it was submitted?

23             MS. ALYSSA CARTON:  I don't think so.  I don't

24    remember.

25             MS. ANNA INDAHL:  Were you at the hearing on
```

1    your IFP application?

2              MS. ALYSSA CARTON:  No.

3              THE COURT:  There was no hearing.

4              MS. ALYSSA CARTON:  There was no hearing.

5    Yeah.

6              MS. ANNA INDAHL:  Okay.  Did the contract with

7    Litigation Management Services say that you would be --

8    that they would be responsible for any sanctions awarded

9    against you?

10             MS. ALYSSA CARTON:  I don't remember that part,

11   but that -- yeah, I don't remember that part.

12             MS. ANNA INDAHL:  So you don't know whether it

13   said that or not?

14             MS. ALYSSA CARTON:  I don't think so, but I

15   don't remember.  Yeah.

16             MS. ANNA INDAHL:  Okay.  You said you met with

17   what you called the team of people, with Ms. Carton's

18   team -- I'm sorry -- with Ms. Pomeranz's team?  I

19   apologize.

20             MS. ALYSSA CARTON:  That's fine.  Say that one

21   more time.

22             MS. ANNA INDAHL:  Yeah.  That was a bad

23   question.  So you said that you met with Ms. Pomeranz's

24   what you called her team?

25             MS. ALYSSA CARTON:  Yes.

1          MS. ANNA INDAHL:  Who was on that team?

2          MS. ALYSSA CARTON:  Well, Craig is the name,

3     the driver.  And that's the only person I met.  Well, the

4     woman that was driving me in the beginning of the --

5     yeah, at the beginning of when we started filing the

6     cases.  I think there was another woman, too, but I don't

7     remember her name offhand.

8          MS. ANNA INDAHL:  What went so wrong with that

9     driver that Ms. Pomeranz terminated?

10          MS. ALYSSA CARTON:  She was just aggressive and

11     really rude to people, and she was making me

12     uncomfortable when I was in the vehicle with her.

13          MS. ANNA INDAHL:  So what was she doing that

14     was rude and aggressive?

15          MS. ALYSSA CARTON:  Shouting at people.  Not

16     letting me speak.  You know, she just acted like she was

17     my, you know, protector, bodyguard or something.  Like I

18     don't need a bodyguard.  We're just going in and looking

19     at barriers.

20          MS. ANNA INDAHL:  How long did you work with

21     her?

22          MS. ALYSSA CARTON:  Let's see.  From -- I want

23     to say from November to like January, but I don't quite

24     remember.  I'm sorry.

25          MS. ANNA INDAHL:  Okay.  Can you turn to

1    Exhibit K in that packet of materials that I gave to you,

2    please?

3              MS. ALYSSA CARTON:  Sure.

4              MS. ANNA INDAHL:  It's kind of towards the end.

5              MS. ALYSSA CARTON:  I'm sorry.  I'm getting a

6    little dizzy.

7              THE COURT:  If at any time you need a break,

8    just let me know.

9              MS. ALYSSA CARTON:  Oh, thank you for that.

10   Yeah, I might actually need that.  I might actually need

11   a break.  Go back to what your question was.

12             MS. ANNA INDAHL:  Maybe your attorney can help

13   you.  It's Exhibit K in that packet of materials.

14             MS. ALYSSA CARTON:  Yes, I'll have her help me.

15   I'm trying to do this by myself.  I can't do this.

16             MS. ANNA INDAHL:  And if you look on Page 3 of

17   that, I'll represent to you that this is a settlement

18   package that your attorney sent, or I guess one of the

19   employees of Litigation Management sent to us.

20             MS. ALYSSA CARTON:  Sure.  Okay.

21             MS. ANNA INDAHL:  This is from Ashley

22   Iannacone, who's sent information about your case in the

23   Carroll Ventures matter to us.

24             MS. ALYSSA CARTON:  Okay.

25             MS. ANNA INDAHL:  And that's the Office Depot

1    case.

2              MS. ALYSSA CARTON:  Yeah.

3              MS. ANNA INDAHL:  If you look at Page 3, you

4    see a picture of somebody taking a photograph, and you

5    can see her reflection in a mirror?

6              MS. ALYSSA CARTON:  Yes.

7              MS. ANNA INDAHL:  Who is that?

8              MS. ALYSSA CARTON:  Do you want her name?

9              MS. ANNA INDAHL:  Yes.

10             MS. ALYSSA CARTON:  Okay.  Her name is Holly.

11             MS. ANNA INDAHL:  Holly what?

12             MS. ALYSSA CARTON:  Charron.

13             MS. ANNA INDAHL:  Charron?

14             MS. ALYSSA CARTON:  I think that's her last

15   name.  I don't quite remember the last name, but I think

16   that's how you say it, yes.

17             MS. ANNA INDAHL:  Who is that?

18             MS. ALYSSA CARTON:  She's the person who was

19   with me in the beginning of the cases.

20             MS. ANNA INDAHL:  Was she the driver that you

21   terminated, that you said was aggressive?

22             MS. ALYSSA CARTON:  Yes.

23             MS. ANNA INDAHL:  Okay.  How did you now

24   remember her name?

25             MS. ALYSSA CARTON:  Just by looking at her

```
1    picture.

2              MS. ANNA INDAHL:  Okay.

3              THE COURT REPORTER:  Could you spell her last

4    name, please?

5              MS. ALYSSA CARTON:  Let's see.  Her last name?

6              THE COURT REPORTER:  Charron?

7              MS. ALYSSA CARTON:  Yes.  No, I mean, I

8    remember her last name, but I just don't remember how to

9    spell it.  I think it's C-H-A-R-R-O-N, but I could be

10   wrong.

11             THE COURT REPORTER:  Thank you.

12             THE COURT:  Thank you.

13             MS. ANNA INDAHL:  And she was the driver?

14             MS. ALYSSA CARTON:  Yes.

15             MS. ANNA INDAHL:  Did she also do the

16   measurements?

17             MS. ALYSSA CARTON:  Well, it looks like she

18   did, yeah.  I'm sorry.  I'm being sarcastic, but she's

19   got the measuring stick in the...

20             MS. ANNA INDAHL:  So that's her hand with the

21   measuring tape?

22             MS. ALYSSA CARTON:  Yeah, I would -- yeah.

23             MS. ANNA INDAHL:  Were you there when she did

24   that?

25             MS. ALYSSA CARTON:  I don't think so, no.
```

1               MS. ANNA INDAHL:  So you have a picture of

2      yourself in front of the building, as well, that

3      you're --

4               MS. ALYSSA CARTON:  Yes.

5               MS. ANNA INDAHL:  That Ashley Iannacone sent to

6      me?

7               MS. ALYSSA CARTON:  Yes.

8               MS. ANNA INDAHL:  When was that picture taken?

9               MS. ALYSSA CARTON:  On the form?  I don't know.

10     What's the date on that?

11              MS. ANNA INDAHL:  It says 11/28.

12              MS. ALYSSA CARTON:  It does say 11/28, yeah.

13              MS. ANNA INDAHL:  So did you pose in front of

14     the building for that picture?

15              MS. ALYSSA CARTON:  Yes.

16              MS. ANNA INDAHL:  And who took the picture?

17              MS. ALYSSA CARTON:  She did.

18              MS. ANNA INDAHL:  And so -- but you were not

19     inside when she did the measurements?

20              MS. ALYSSA CARTON:  I did go inside.  I saw all

21     the measurements and the locations, but she had to help

22     me with the measuring, with the measurements.

23              MS. ANNA INDAHL:  Okay.  But you just said you

24     weren't there when she did the measurements.

25              MS. ALYSSA CARTON:  I don't remember if I was

1    there, the actual date.  There were days where she'd go

2    and measure things first, and then I'd go back.  So I

3    apologize for the confusion.

4            MS. ANNA INDAHL:  Okay.  So if you can flip

5    ahead to --

6            THE COURT:  Oh, actually if you would flip

7    towards the beginning --

8            MS. ALYSSA CARTON:  Sure.

9            THE COURT:  -- a couple of pages, and that

10   would be on Exhibit J.

11           MS. ALYSSA CARTON:  Okay.

12           MS. ANNA INDAHL:  That's what I was looking

13   for, Your Honor.  Go ahead.

14           THE COURT:  You see that there are those

15   pictures that are taken at that location.  It appears to

16   be a Chevron?

17           MS. ALYSSA CARTON:  Yes.

18           THE COURT:  Okay.  And those pictures are all

19   taken on January 20th, with the exception of the picture

20   of you.  So did that individual take those measurements?

21           MS. ALYSSA CARTON:  That's what I would assume,

22   yeah.

23           THE COURT:  And then you came back a day later

24   to have your picture taken in front?

25           MS. ALYSSA CARTON:  Yeah, I went back and I

1    confirmed that the barriers were there.  I think we set

2    it up that way because I was tired or something like

3    that.  I didn't have the energy to -- you know.

4            THE COURT:  So your driver would go and scope

5    out violations, and then you would go and pose in front

6    of them and make sure --

7            MS. ALYSSA CARTON:  I would make sure that the

8    violations there were, that they were true violations,

9    and then we would take a picture of me being there,

10   because I was there.

11           THE COURT:  All right.  Ms. Indahl?

12           MS. ANNA INDAHL:  Yes.  The same if you go to

13   Exhibit I?  That's the one with Buffett's Candies.

14   Pictures are taken of the supposed ADA violations on the

15   2nd of January, but you're posing in front of the

16   building on the 7th of January?

17           MS. ALYSSA CARTON:  Yes.

18           MS. ANNA INDAHL:  So it was five days later on

19   that one?

20           MS. ALYSSA CARTON:  It looks like it, yeah.

21           MS. ANNA INDAHL:  Did you ever go inside the

22   building at Buffett's Candies?

23           MS. ALYSSA CARTON:  I'm a regular customer of

24   Buffett's Candies.  I've been there since I was a child.

25           MS. ANNA INDAHL:  And so have you ever

1    experienced a barrier to entry to the store?

2              MS. ALYSSA CARTON:  Well, when I was a child I

3    didn't drive, so -- I'm sorry, but --

4              MS. ANNA INDAHL:  How about lately?

5              THE COURT:  Yes, recently.

6              MS. ALYSSA CARTON:  I don't drive, but my

7    friends drive, and so I probably assumed that I was being

8    a tester over there and was trying to help make it

9    accessible to other people who were in wheelchairs that

10   do drive.

11             MS. ANNA INDAHL:  But I'm asking, have you ever

12   personally experienced a barrier that didn't allow you

13   access to the candy store?

14             MS. ALYSSA CARTON:  Well, when I'm with my

15   friends, yeah, but I don't know if that really counts.

16             MS. ANNA INDAHL:  I'm talking about for the

17   purposes of the complaint that you filed.

18             MS. ALYSSA CARTON:  No.  Well, I was in a van

19   when we went, so I guess you can say yes.  But I don't

20   know if that really sticks well in this situation.

21             MS. ANNA INDAHL:  What was your barrier in the

22   van when you went?

23             MS. ALYSSA CARTON:  The parking violation.

24   Doesn't it say what the violation is?  I need to read it.

25   Apparently the document doesn't have what the barrier was

```
 1        at that time.
 2                   THE COURT:  Let me ask you --
 3                   MS. ALYSSA CARTON:  The situation --
 4                   MS. ANNA INDAHL:  I'm just asking -- yes.
 5                   THE COURT:  As opposed to measurements, is
 6        there anything that ever kept you from entering Buffett's
 7        Candies?
 8                   MS. ALYSSA CARTON:  No.
 9                   THE COURT:  Okay.
10                   MS. ANNA INDAHL:  And are you aware whether or
11        not the supposed violations that your driver found on
12        January 2nd existed on January 7th?
13                   MS. ALYSSA CARTON:  No, I don't know.
14                   MS. ANNA INDAHL:  Okay.
15                   MS. ALYSSA CARTON:  Are we talking about
16        Buffett's, or are we talking about other places?
17                   MS. ANNA INDAHL:  I was talking about
18        Buffett's.
19                   MS. ALYSSA CARTON:  Okay.  Yeah, she's measured
20        the parking sign, but I knew that was there, so that's
21        all.
22                   MS. ANNA INDAHL:  Okay.  And the same with the
23        Chevron gas station?  You were there a day later.  Are
24        you confident that the same violations existed?
25                   MS. ALYSSA CARTON:  Is that on the next
```

```
 1        document?

 2                MS. ANNA INDAHL:  Yes, it was on Letter J that

 3        we just talked about.

 4                MS. ALYSSA CARTON:  Okay.  I can't find it.

 5        I'm sorry.

 6                MS. ANNA INDAHL:  That's okay.  It's the next

 7        exhibit.  Maybe your attorney can help you.

 8                MS. ALYSSA CARTON:  Okay.

 9                MS. SHARON POMERANZ:  We're at J.

10                MS. ALYSSA CARTON:  Oh, we're at J.

11                MS. ANNA INDAHL:  I'm looking at the photos.

12                MS. ALYSSA CARTON:  So what was your question

13        again?  I'm sorry.

14                MS. ANNA INDAHL:  My question was:  These

15        photos were taken on different days than the one that you

16        appear in?

17                MS. ALYSSA CARTON:  Yes.

18                MS. ANNA INDAHL:  Are you confident that the

19        violations existed on the day that you appeared in the

20        photos?

21                MS. ALYSSA CARTON:  Yes.

22                MS. ANNA INDAHL:  How are you confident of

23        that?

24                MS. ALYSSA CARTON:  Well, she -- let's see.

25        The picture has, you know, no signs.  I mean, I went
```

1    back, you know, and I saw the same barriers.

2              MS. ANNA INDAHL:  There are signs.  I'm not

3    clear what you mean there.

4              MS. ALYSSA CARTON:  Okay.  I -- well, maybe the

5    barrier was that they're not high enough.  I know that

6    the picture of the sink is the main, yes, and exposed

7    pipe is part of the barrier, the main barrier.

8              MS. ANNA INDAHL:  Did you go into the restroom?

9              MS. ALYSSA CARTON:  Yes, I did.

10             MS. ANNA INDAHL:  And why didn't you take the

11   photos on the day you were there?

12             MS. ALYSSA CARTON:  I'm not tech savvy, and so

13   it was just, "Here, you do it."  Laziness, I guess.  I

14   don't know.

15             MS. ANNA INDAHL:  Okay.  Why didn't your driver

16   take the pictures of the supposed violations on the day

17   you actually visited the location?

18             MS. ALYSSA CARTON:  Say that one more time.

19   I'm sorry.

20             MS. ANNA INDAHL:  Why didn't your driver take

21   photos of you at the location on the day you supposedly

22   experienced a barrier at that location?

23             MS. ALYSSA CARTON:  I don't know.  You'd have

24   to ask her.

25             MS. ANNA INDAHL:  Okay.  And going to the next

1    exhibit, which is Exhibit K --

2              MS. ALYSSA CARTON:  Sure.

3              MS. ANNA INDAHL:  -- would you take a look at

4    those, please, the photos?  Are you there?

5              MS. ALYSSA CARTON:  Oh, sorry.

6              MS. ANNA INDAHL:  This is of the Office Depot?

7              MS. ALYSSA CARTON:  Yes.

8              MS. ANNA INDAHL:  Have you been to that Office

9    Depot?

10             MS. ALYSSA CARTON:  Yes.

11             MS. ANNA INDAHL:  Inside?

12             MS. ALYSSA CARTON:  Yes.

13             MS. ANNA INDAHL:  And are you aware that there

14   is a soap dispenser that is ADA compliant?

15             MS. ALYSSA CARTON:  I'm not.  Maybe that

16   happened after we filed.  I'm not sure.

17             MS. ANNA INDAHL:  No, it's been there since the

18   building was constructed.

19             MS. ALYSSA CARTON:  Okay.

20             MS. ANNA INDAHL:  Are you aware that there's a

21   paper towel holder that is ADA compliant?

22             MS. ALYSSA CARTON:  Apparently not, no.

23             MS. ANNA INDAHL:  Okay.  So if you went into

24   the bathroom and you saw the two soap dispensers together

25   and you saw that one was ADA compliant, would you have

1    brought your lawsuit against them?

2              MS. ALYSSA CARTON:  No, probably not.  I

3    wouldn't, no.

4              MS. ANNA INDAHL:  Okay.  And same with the

5    aisleways.  You claim that the aisleways were too narrow

6    there.  Did you actually navigate the aisleways at that

7    store?

8              MS. ALYSSA CARTON:  I'm -- I'm pretty sure I

9    did.  I don't remember filing that claim about it, but

10   yeah.

11             MS. ANNA INDAHL:  Okay.  So you don't recall

12   experiencing any barriers, as we sit here today, at the

13   Office Depot?

14             MS. ALYSSA CARTON:  No.

15             MS. ANNA INDAHL:  Okay.  Have you ever been an

16   employee of ADA -- I'm sorry -- of AID?

17             MS. ALYSSA CARTON:  No.

18             MS. ANNA INDAHL:  Have you ever been an

19   employee of Litigation Management Services?

20             MS. ALYSSA CARTON:  No.

21             MS. ANNA INDAHL:  Did Ms. Pomeranz give you a

22   list of ADA regulations and encourage you to go find the

23   barriers and experience them?

24             MS. ALYSSA CARTON:  Say that one more time.

25             MS. ANNA INDAHL:  Did Ms. Pomeranz give you a

1   list of ADA regulations and encourage you to go

2   experience those barriers before bringing your lawsuits?

3          MS. ALYSSA CARTON:  Well, I think she would

4   give me -- she gave me a list of things so that I would

5   know what I was doing when I would go out.  I mean, you

6   know, in case I didn't know all of the violations.  I

7   knew them all before I went out.  But yeah.

8          MS. ANNA INDAHL:  What did the list say?

9          MS. ALYSSA CARTON:  You know, basic things

10  about, you know, soap dispenser height and paper towel

11  dispenser height and countertop height and things of that

12  nature.

13         MS. ANNA INDAHL:  So did you feel, as you were

14  doing this, like you were auditing these businesses to

15  find violations on behalf of the disabled community?

16         MS. ALYSSA CARTON:  I'm not really sure if I

17  felt like that or not.  You know, I was trying to just

18  focus on going out and experiencing barriers.

19         MS. ANNA INDAHL:  I'm not clear as to your

20  testimony.  Have you been paid, to date, from Litigation

21  Management Services any money?

22         MS. ALYSSA CARTON:  I don't know how to answer

23  that.  I feel like I already did.  I'm sorry.

24         MS. ANNA INDAHL:  We've talked about whether

25  there was a $50 per test provision, and you've also said

1    that you got some money for settlement, and I'm wondering

2    if any money you've received with regard to these cases

3    has come from Litigation Management Services?

4             MS. ALYSSA CARTON:  Okay.  Okay.  Here's my

5    affidavit.  It says:  During the previous two months,

6    February 3, 2017, to April 3rd, I have received

7    additional income above the 2500 monthly income I

8    reported in my IFP motions.

9             Okay.  So apparently I did.

10            I affirm that I will pay half of my additional

11   income rounded to the nearest $50 -- I don't know what

12   the parentheses is about -- to this Court in the manner

13   outlined in the order.

14            I also affirm to make monthly payments of $50

15   to the Court as required by the order.

16            So --

17            MS. ANNA INDAHL:  Okay.  So how much have you

18   been paid from Litigation Management Services to date?

19            MS. ALYSSA CARTON:  I don't have the amount

20   with me.  I'm sorry.

21            MS. ANNA INDAHL:  Do you have a ballpark

22   estimate?

23            MS. ALYSSA CARTON:  I would think about $5,000

24   or something like that.  I don't -- I don't remember.

25            MS. ANNA INDAHL:  And did you have to pay part

1    of that money to your attorney for her fees?

2              MS. ALYSSA CARTON:  No.

3              MS. ANNA INDAHL:  That was all money to you?

4              MS. ALYSSA CARTON:  I think so.  Yeah.

5              MS. ANNA INDAHL:  Your Honor, can we move to

6    unseal that since she just read it into the record?  I

7    don't see why it needs to be protected under seal since

8    it has been read in open court.

9              THE COURT:  Is the affidavit under seal?

10             MS. SHARON POMERANZ:  It was filed under seal,

11   but the contents of it have been disclosed.

12             THE COURT:  All right.

13             MR. SPENCER REID:  Your Honor, this brings up a

14   point here.

15             THE COURT:  And speak loudly for me, Mr. Reid.

16             MR. SPENCER REID:  There are approximately 100

17   lawsuits filed.  I had no idea that she filed an

18   affidavit, let alone filed it under seal.  I don't know

19   how she could have filed it under seal.  In other words,

20   some parties are getting some information, and other

21   parties are not.  We don't have that package from the

22   Litigation Management Services.  So some attorneys are

23   getting some information, some defense parties are, and

24   others are not.

25             THE COURT:  Let me do this.

1          MS. ALYSSA CARTON:  Yes, ma'am.

2          THE COURT:  If I could get that affidavit, and

3    what we will do is make it an exhibit, the Court's

4    exhibit to today's hearing, so that everybody will have

5    access to it.

6          MS. SHARON POMERANZ:  Let me be clear.  This

7    was not provided to any defense counsel.  This was a

8    court's order to update her IFP.  This was not provided

9    to anybody, so you were not left out.

10          THE COURT:  All right.  I have a question about

11   your agreement with Litigation Management.

12          MS. ALYSSA CARTON:  Are you addressing me?

13          THE COURT:  Yes, Ms. Carton.

14          MS. ALYSSA CARTON:  Okay.  Sorry about that.

15          THE COURT:  You indicated that Litigation

16   Management Services would reimburse you for the cost of

17   bringing these cases?

18          MS. ALYSSA CARTON:  I guess I did, yeah.

19          THE COURT:  Okay.  And is Ms. Pomeranz also a

20   signatory to that agreement with Litigation Management

21   Services?  Did she sign off on it?

22          MS. ALYSSA CARTON:  There was an agreement

23   between me and Ms. Pomeranz.  Does that answer your

24   question, or are you asking something different?  I'm

25   sorry.

```
 1              THE COURT:  Well, I don't know.  Did you have a

 2     separate agreement with Ms. Pomeranz from your agreement

 3     with Litigation Management Services?  Were there two

 4     agreements, or one?

 5              MS. ALYSSA CARTON:  There was -- huh?

 6              MS. SHARON POMERANZ:  You don't remember?

 7              MS. ALYSSA CARTON:  No.

 8              MS. SHARON POMERANZ:  Could I show them to her?

 9              THE COURT:  Yes, go ahead and show them to her.

10              MS. ALYSSA CARTON:  Yes.

11              MS. SHARON POMERANZ:  Could I refresh her

12     memory?

13              THE COURT:  Yes.

14              MS. ALYSSA CARTON:  Yes, please.

15              MS. SHARON POMERANZ:  I have mine.  This is

16     what you signed.

17              MS. ALYSSA CARTON:  Yeah, that's the document

18     that I signed with her.

19              THE COURT:  With Ms. Pomeranz?

20              MS. ALYSSA CARTON:  Yes.

21              THE COURT:  Is that the same agreement that you

22     had with Litigation Management?

23              MS. ALYSSA CARTON:  Yes.

24              THE COURT:  And is that -- I thought you didn't

25     have the agreement today.
```

1              MS. SHARON POMERANZ:  This is our retainer.

2              MS. ALYSSA CARTON:  Oh, that's our retainer.

3     I'm sorry.

4              MS. SHARON POMERANZ:  Our agreement with

5     Litigation Management is separate.

6              THE COURT:  Okay.

7              MS. ALYSSA CARTON:  Yeah.

8              MS. SHARON POMERANZ:  That, we don't have.

9              MS. ALYSSA CARTON:  That, we don't have today.

10    I'm sorry.

11             MS. SHARON POMERANZ:  But the parties to this

12    are just she and I.

13             THE COURT:  And was Ms. Pomeranz aware that

14    Litigation Management Services had agreed to reimburse

15    you for your costs?

16             MS. ALYSSA CARTON:  I'm not sure.  I would

17    assume so.

18             MS. SHARON POMERANZ:  Yes.

19             MS. ALYSSA CARTON:  Yeah.

20             THE COURT:  Is that the case, Ms. Pomeranz?

21             MS. SHARON POMERANZ:  Yes.

22             THE COURT:  All right.

23             MS. SHARON POMERANZ:  That's why we submitted

24    to the Court that she was given that money for

25    litigation.

1          THE COURT:  You're going to have to use the

2    microphone.

3          MS. SHARON POMERANZ:  That's why I helped her

4    prepare the affidavit that I was aware of that, and we

5    updated the Court about those litigation expenses.  And

6    so I'm sorry if there has been confusion that we've been

7    working with an outside litigation funding group.  They

8    work for me.  I have a funding agreement, and I think

9    that's where all of this confusion stemmed from.

10         Somehow, the news caught on to the fact that

11   they were alleging she was paid by an outside

12   organization or group when they heard that there was

13   money.  But that was part of our litigation funding

14   agreement.  That was not an outside group.

15         And so, you know, I think that --

16         THE COURT:  So did you, personally, agree to

17   reimburse costs, including filing fees, to your client?

18         MS. SHARON POMERANZ:  No.  That's why we hired

19   a litigation management group, because she's indigent and

20   doesn't have money, and I didn't have the money to fund

21   litigation, and so it's a very common practice.  I read a

22   lot of ADA articles on it, that lawyers work with

23   litigation funding groups.  They're management groups.

24   They provide litigation support and litigation funding.

25   Specifically, the ADA model rule says that that is the

1    way to handle indigent cases.  So we thought we were

2    developing a model that was supporting the litigation to

3    make a change in civil rights.

4              So, you know, after working in family law for

5    so many years, I find it ironic that I finally want to do

6    civil rights work, and now I get accused of being in a

7    racket, when really family law is, you know, much more of

8    a racket than civil rights lawyers who are trying to do

9    good and make change and help disabled people.

10             And we did that through a funding agreement.  I

11   had a funding agreement with a company.  And I apologize.

12   I thought it was through Google as opposed to Craigslist.

13   This company and I met and decided that we would like to

14   do civil rights work, and we put ads up.  I'm sorry.  I

15   thought she had answered my other ad on Google ads, but

16   we had run a couple of ads.

17             And there is nothing unethical or improper

18   about getting litigation funding, as far as I understood

19   it.  But the whole model didn't work for Ms. Carton, and

20   that's why she wanted to dismiss the cases, and that's --

21   she has been a little uncomfortable about this, as she

22   has told you.  And we would like to, you know, respect

23   her decision to dismiss the cases.

24             We are really here on IFP.  She has disclosed

25   all of her income regarding her disability, and so I'm

```
1        not sure what the Litigation Management --

2                    THE COURT:  Ms. Pomeranz?

3                    MS. SHARON POMERANZ:  Yes?

4                    THE COURT:  She did not disclose that any

5        entity would be reimbursing her for the costs of

6        litigation.  And, in fact, she filled out that affidavit

7        for IFP, indicating she could not afford those.  I'm not

8        aware of -- I am familiar with this case out of the

9        District of Nevada, that's Exhibit Q, in which Litigation

10       Management and Financial Services, LLC, which I assume is

11       the same entity that we're discussing today, indicates it

12       had a direct pecuniary interest in the outcome of this

13       case, and it moved to withdraw IFP status because the

14       Court was entitled to have that information when it

15       evaluated whether or not you, Ms. Carton, qualified as an

16       individual so that there would be no pre-payment of fees.

17                   MS. SHARON POMERANZ:  Well, if the Court would

18       like me to proceed accordingly, the Litigation Management

19       Company hasn't filed that in this case.  They didn't

20       notify me that they were going to be filing that in our

21       cases, and they approved her request to dismiss the

22       cases.  But if you would rather procedurally that we

23       proceed that way, I can withdraw her IFP based on

24       Litigation Management's role in the case, as was done in

25       Nevada.
```

1          THE COURT:  They approved her request to

2    dismiss the cases?

3          MS. SHARON POMERANZ:  Yes.

4          THE COURT:  Who's running this litigation?

5          MS. SHARON POMERANZ:  Well, they don't want to

6    make her uncomfortable, and they were aware of the

7    push-back and the difficulties we were experiencing, and

8    the model didn't turn out as maybe it hasn't in other --

9    you know, for other attorneys.

10          I haven't met the attorney in the Nevada case

11    or spoken with him at all.

12          THE COURT:  How about the one in Colorado?

13          MS. SHARON POMERANZ:  No.  I'm not connected

14    with -- Litigation Management is doing those arrangements

15    with other attorneys, and I only have an individual

16    agreement with them.

17          THE COURT:  I have a question for you, then.

18    New Mexico ADA, your website.  Are you familiar with your

19    website?

20          MS. SHARON POMERANZ:  We created -- the

21    Litigation Management Company and I created an e-mail so

22    that we could all work together, and a website so we

23    could all work together.  And that's what has been

24    submitted to the Court here, as well.  And we had one

25    e-mail we shared for correspondence.

```
 1                THE COURT:  Ms. Pomeranz, I have your website

 2      here.  Word for word, it's "Welcome to New Mexico ADA."

 3      Its content is verbatim that of the Colorado attorney's

 4      website, ADA Justice, with one exception.  You refer to

 5      New Mexico ADA, but even in the second paragraph, it

 6      indicates, "With the experience of over 1,000 ADA Title

 7      III cases, ADA Justice has extensive knowledge."

 8                So it appears you copied it.

 9                MS. SHARON POMERANZ:  Well, that was in

10      reference to the litigation management team's experience.

11      That is their website.  They manage the litigation, so

12      they did all of --

13                THE COURT:  So what is your role, other than to

14      file --

15                MS. SHARON POMERANZ:  I drafted the complaint.

16                THE COURT:  Okay.  I'm sorry if I'm taking over

17      at this point.

18                MS. ANNA INDAHL:  No, no.

19                MS. SHARON POMERANZ:  I drafted the complaint.

20      That was my main role.  When I first contacted -- when I

21      first made contact with them, I wanted to draft the

22      complaint because it was my case.

23                THE COURT:  So why is it virtually word for

24      word those complaints that have been filed in Colorado?

25                MS. SHARON POMERANZ:  They asked to use it for
```

1    their -- to save costs in their other cases.

2              THE COURT:  So you did not draft it?  The

3    Litigation Management Services did?

4              MS. SHARON POMERANZ:  Not all the people in

5    Litigation Management are attorneys.  A lot of them are

6    paralegals.  So I drafted it.  They had input.  I said

7    that at the last hearing, that I consulted and worked

8    with other attorneys from Litigation Management.  I was

9    the main leading drafter on that.  Then it became our

10   work product as a team.  And then it was public, and we

11   thought it was the best complaint that we could fashion.

12             THE COURT:  You're saying "we."

13             MS. SHARON POMERANZ:  Me and my litigation

14   support team.  They supported me with staff, with

15   drivers, with funding mainly, to pursue the litigation.

16             THE COURT:  So it appears to me that they are

17   the moving force and doing all the work in these cases.

18             MS. SHARON POMERANZ:  We shared the work,

19   according to our roles in the litigation.

20             THE COURT:  I note that -- I have the first

21   complaint that you filed against Carroll Ventures, Inc.,

22   and what I did is, I highlighted what was changed from

23   those Colorado complaints that have been filed months

24   earlier in the District of Colorado.  There are very,

25   very few changes, and nothing of any real substance.

1           I do note that on the first page of the Carton

2    v. Carroll Ventures complaint, the street name is

3    misspelled.  Was that your doing?

4           MS. SHARON POMERANZ:  Perhaps it was a typo.

5           THE COURT:  How about "Alburquerque," the

6    spelling of "Alburquerque"?  Who was drafting these

7    complaints?  It was you or your litigation staff, as you

8    referred to them?

9           MS. SHARON POMERANZ:  We worked all together,

10   as a team.  That's -- I couldn't do all these cases on my

11   own.  And I explained to the Court, we developed one

12   template, and we used it for all of the rest, and that

13   that is the same model they must have been using in their

14   other litigation support efforts.

15          You know, they -- they worked under my

16   direction.  They worked for me.  And so I didn't disclose

17   to Ms. Carton all of their names and all of their

18   identities because I hired them to support the

19   litigation.  She didn't hire them.

20          THE COURT:  Who prepared the affidavit for IFP?

21          MS. SHARON POMERANZ:  I gave it to Ms. Carton,

22   and she gave me her income, and then I had my staff put

23   it into the form, and then we all reviewed it.

24          THE COURT:  The form from the District of

25   Colorado?

JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
FEDERAL OFFICIAL COURT REPORTER
333 Lomas Boulevard, Northwest
Albuquerque, New Mexico  87102

1          MS. SHARON POMERANZ:  Yes.  That was an error.

2     I'm sorry we made many procedural errors.  That is

3     another reason we wanted to dismiss, is our model didn't

4     work out the way we intended.  When we started, this was

5     about compliance, and it has had a real chilling effect.

6     The ADA was intended to allow plaintiffs who were

7     indigent to bring cases.  And the reason that the

8     imbalance in the fees was created was to avoid a chilling

9     effect, but that's exactly what has happened.

10          THE COURT:  I think with the filing of these

11    lawsuits, yes, indeed, that is what has happened.

12          MS. SHARON POMERANZ:  Yes.  And so we'd like to

13    dismiss, because we all see the error.  I'd like to point

14    out, as well, you know, defense counsel is here, arguing

15    about money and fees.  Not a single one of them made a

16    Rule 68 offer of judgment to cut off fees or asked for

17    dispute resolution.  And so I think that there's lots of

18    fault to be spread around here, Judge.  And Ms. Carton

19    mainly wants to dismiss.

20          THE COURT:  I'll let you get there.

21          MS. SHARON POMERANZ:  Because she feels that --

22    because she doesn't want to incur any more risk.  The

23    Court has made it clear that she will be responsible for

24    fees if the defendants prevail.  She doesn't want to take

25    that risk.  And we can't incur any more fees.  She is

1    indigent.

2              THE COURT:  Your staff members --

3              MS. SHARON POMERANZ:  Yeah.

4              THE COURT:  -- those names that were mentioned

5    by Ms. Indahl, they carry your e-mail address extension,

6    correct?

7              MS. SHARON POMERANZ:  Right.  We work together

8    through one e-mail, and any time someone uses that

9    e-mail, it came to all of our computers because we were

10   working remotely.

11             THE COURT:  Are you telling me that you were

12   unaware that your staff had previously used the AID.org

13   extension on their e-mail?

14             MS. SHARON POMERANZ:  I had not seen those.

15   Any e-mails that we sent out were under

16   sharon@newmexicoada.  And I am also unaware of their

17   connection.  When I met them, they were a stand-alone

18   litigation company.  I hadn't heard of AID until the news

19   here.

20             THE COURT:  Did you do any research at all into

21   this Litigation Management Services?

22             MS. SHARON POMERANZ:  Yes.  I checked if they

23   were in good standing in their state, and they were.

24             THE COURT:  Did you check to see if they were

25   actually a different name for that entity AID?

```
1              MS. SHARON POMERANZ:  Right.  Under the

2     Secretary of State, they didn't have a d/b/a.  They were

3     just a litigation company in good standing.

4              THE COURT:  All right.  I'll let you continue.

5              MS. ANNA INDAHL:  Okay.  Can I ask Ms. Pomeranz

6     a question?  Or just Ms. Carton?

7              THE COURT:  I think you can.

8              MS. ANNA INDAHL:  Okay.  So, Ms. Pomeranz, I'm

9     confused about your very clear testimony, or what would

10    seem clear testimony about your drafting these

11    complaints.  So the Arizona complaint was filed a month

12    before the Carton -- or the Carroll Ventures case in this

13    district was filed.  How do you explain that?

14             MS. SHARON POMERANZ:  I don't know about the

15    time frame for the --

16             MS. ANNA INDAHL:  Okay.  Well, then, I want you

17    to --

18             MS. SHARON POMERANZ:  No, I --

19             THE COURT:  Excuse me.  You all can't speak

20    over each other.  The court reporter can't take two at a

21    time.

22             MS. SHARON POMERANZ:  I have been working with

23    Litigation Management Company since August, and so we've

24    been -- we were drafting complaints months and months ago

25    as a team that they were using to pursue civil rights
```

1    enforcement.  But those arrangements with other states

2    did not involve me, so you would have to ask them about

3    it.

4         MS. ANNA INDAHL:  So I'm just asking how you

5    explain the fact that -- so okay.  Let me back up.  So

6    when did you draft this Carroll Ventures complaint?

7         MS. SHARON POMERANZ:  I drafted it over a

8    period of months, starting in August.  As Ms. Carton

9    said, when she met the group, that's when I hired them.

10        MS. ANNA INDAHL:  So you started drafting the

11   complaint before she had experienced any barriers at any

12   business in Albuquerque?

13        MS. SHARON POMERANZ:  Sure.  We were preparing

14   for litigation for the -- well, she had already told me,

15   when I met her at her house, all the barriers she faced

16   every day.  That we already knew, that she encountered

17   barriers, and there's clearly many barriers nationwide.

18        MS. ANNA INDAHL:  So your testimony is that you

19   started drafting this complaint in Carroll Ventures,

20   which became the complaint in all of these named --

21        MS. SHARON POMERANZ:  We didn't have the name.

22   We just drafted a general ADA Title III complaint.  We

23   didn't have, as you say, a Carroll Ventures yet because

24   she hadn't visited any -- she hadn't experienced barriers

25   at any particular defendant.

1           MS. ANNA INDAHL:  Okay.  So her first visit, as

2     you claim in your lawsuits -- and I looked at all of them

3     to see when the barrier was supposedly experienced, and

4     the first one is in LBC Company, which is Case Number

5     0044, which was November 7, 2016.  So is it your

6     testimony that you started drafting the complaint in

7     August, before gathering any facts as to any actual

8     barriers until November of 2016?

9           MS. SHARON POMERANZ:  Yes.  I was drafting the

10    implementing regulations and I was doing the research on

11    standing, because we wanted to make sure that we didn't

12    have any issues with standing.

13          MS. ANNA INDAHL:  Okay.

14          MS. SHARON POMERANZ:  And it took a lot of

15    preparation.  It was a new area of law for me.

16          MS. ANNA INDAHL:  And the District of Colorado

17    complaint, the Umphenour -- I apologize if I

18    mispronounced her name -- was filed December 8, 2016.

19    Did you have your complaint completed by that time?

20          MS. SHARON POMERANZ:  Yes, we did.

21          MS. ANNA INDAHL:  When did you have it

22    completed?

23          MS. SHARON POMERANZ:  I don't remember the

24    exact date.  It was shared in a drop box.  We were all

25    working on it.  This was a litigation team.

1          MS. ANNA INDAHL:  And who was on the team?

2          MS. SHARON POMERANZ:  The Litigation Management

3    team.

4          MS. ANNA INDAHL:  Who were the names of the

5    people on the team?

6          MS. SHARON POMERANZ:  Alex Callan is the owner

7    of that, or the director of that, and she said Alex and

8    Craig.

9          MS. ANNA INDAHL:  And what is Craig's last

10   name?

11         MS. SHARON POMERANZ:  The last name is

12   Broadbent.

13         MS. ANNA INDAHL:  Who else was on your team?

14         MS. SHARON POMERANZ:  Ashley.  The people who

15   you saw on your e-mails, the paralegals, the two staff.

16         MS. ANNA INDAHL:  Can I have their names?  Do

17   you know their names?

18         MS. SHARON POMERANZ:  Ashley Iannacone and Sean

19   Conway.

20         MS. ANNA INDAHL:  Okay.  Anybody else on your

21   team?

22         MS. SHARON POMERANZ:  No.  Litigation

23   Management may have been using people in their work that

24   I don't know about in these other cases.  Obviously, they

25   were connected to lawyers.  I didn't meet her; I didn't

1    communicate with.  But I was aware that they were

2    providing support for civil rights work, and I believe

3    that's appropriate.

4           MS. ANNA INDAHL:  So did you have any pecuniary

5    interest in the outcomes of the Colorado or the Nevada

6    cases?

7           MS. SHARON POMERANZ:  No.  I didn't know the

8    dates of filing, the plaintiffs, or the attorneys.  As

9    I've said, I had no connection to those other suits.  I

10   never met the plaintiffs.  I didn't know their time

11   frame.  I didn't even -- I had no idea who else -- I was

12   only focused on my cases.

13          MS. ANNA INDAHL:  Yet, those cases are using

14   what you claim to have written, your complaint, your work

15   product.

16          MS. SHARON POMERANZ:  The complaint was for

17   Litigation Management.  It was for them to use to support

18   civil rights work.  We --

19          MS. ANNA INDAHL:  But you drafted the

20   complaint.  Are you an employee of Litigation Management?

21          MS. SHARON POMERANZ:  No, I'm not an employee.

22   I drafted it for my complaints, and since they

23   participated, we agreed they could use it for their work.

24          MS. ANNA INDAHL:  Did you --

25          MS. SHARON POMERANZ:  And they used it for my

```
1        work.
2                MS. ANNA INDAHL:  Did you receive any payment
3        for drafting that complaint?
4                MS. SHARON POMERANZ:  No, I did not.
5                MS. ANNA INDAHL:  Why not?
6                MS. SHARON POMERANZ:  Why not?  Because that's
7        not the way we structured our agreement.
8                MS. ANNA INDAHL:  Do you have your agreement
9        with Litigation Management Services?
10               MS. SHARON POMERANZ:  No, I do not.  I didn't
11       -- I don't have my agreement, and she didn't have her
12       agreement, because they're not a party to this, and I
13       don't see how that even is relevant.  I represent her.
14       We filed ADA cases, and we got funding and support, as we
15       should, to bring suits.
16               MS. ANNA INDAHL:  How much funding and support?
17               MS. SHARON POMERANZ:  They were paying the
18       filing fees, and they were providing staff, and they paid
19       her the money to reimburse her for any litigation
20       expenses, the $5,000 that has been shown here.  And we
21       want to cut off any more support because we don't think
22       that she will prevail enough to compensate, to live up to
23       the agreement.  And that's a problem, you know.
24               It was not -- we didn't anticipate that
25       defendants would get any kind of fees, because the
```

1    statute doesn't provide it, and that was something that

2    was unexpected in our model, that I was unaware of, and

3    now we would like to dismiss because of that.  I don't

4    want to advise my client to incur any more risk.

5             When we started this, it was explained to me

6    about the Litigation Management Company, and based on all

7    of my research, the testers were constitutional, and that

8    plaintiffs had the opportunity -- plaintiffs were not

9    prevented from filing suit in their individual capacity

10   and as a tester, and that's why we wrote the complaint

11   that way.  She was an individual and a tester.

12             MS. ANNA INDAHL:  Who represented that to you?

13             MS. SHARON POMERANZ:  Who represented what?

14             MS. ANNA INDAHL:  That it was constitutional to

15   bring a lawsuit as --

16             MS. SHARON POMERANZ:  The Tenth Circuit.

17             MS. ANNA INDAHL:  -- a tester and an

18   individual?

19             MS. SHARON POMERANZ:  That was my research from

20   the Tenth Circuit and discussions with the attorneys on

21   my Litigation Management team, Alex and Craig.

22             MS. ANNA INDAHL:  So Craig is also a driver and

23   a lawyer?

24             MS. SHARON POMERANZ:  That's correct.  And he

25   wanted to -- he's not a lawyer in New Mexico, but he is a

```
 1      lawyer.
 2                  MS. ANNA INDAHL:  Is Alex a lawyer in New
 3      Mexico?
 4                  MS. SHARON POMERANZ:  Not in New Mexico.  But
 5      Alex I never met; I only spoke with on the phone.
 6                  MS. ANNA INDAHL:  So who represented -- you
 7      said "represented" to you --
 8                  MS. SHARON POMERANZ:  I worked with Craig.
 9                  MS. ANNA INDAHL:  -- and that implies you
10      talked to somebody or you had correspondence with
11      somebody, but you're telling me that's the Tenth Circuit
12      representing.  I'm not clear.
13                  MS. SHARON POMERANZ:  Well, my research and my
14      litigation team.  We staffed this extensively.  We did a
15      lot of research.  We didn't want to encounter any of
16      these issues.  We wanted to have valid, meritorious
17      claims based on violations that were statutory, per se
18      violations, was the entire model.  That was the way it
19      was going to go forward because we wanted to advocate
20      properly for her civil rights.
21                  MS. ANNA INDAHL:  So when you talk about the
22      model, and you've mentioned it several times, can you
23      explain to me what the model was?
24                  MS. SHARON POMERANZ:  The model was that they
25      provide funding for indigent people.
```

1          MS. ANNA INDAHL:  That's the model from the

2     beginning?

3          MS. SHARON POMERANZ:  That's the -- that was

4     with the model, that we were discussing how to advocate

5     without being a wealthy person, and it's through

6     litigation funding.  You go to a group, and they give you

7     the funding if you don't have it.

8          MS. ANNA INDAHL:  And on what basis did you

9     file for IFP status?

10          MS. SHARON POMERANZ:  That money is not her

11     money.  That money is money I got to fund the litigation.

12     She is indigent.

13          I don't understand the question.

14          MS. ANNA INDAHL:  So you paid her filing fee?

15          MS. SHARON POMERANZ:  No.  The Litigation

16     Management Company did after the Court ruled on how

17     much she should pay.  They provided me that funding to

18     pay.

19          MS. ANNA INDAHL:  But did you not mislead the

20     Court about her --

21          MS. SHARON POMERANZ:  No.

22          MS. ANNA INDAHL:  -- financial status and

23     ability to pay for her fees?

24          MS. SHARON POMERANZ:  No.  She declared all of

25     her income.  Litigation Management doesn't -- is not her

```
 1        income.  She doesn't work for them.  They fund me and my

 2        litigation if I need funds.

 3                  MS. ANNA INDAHL:  But you're not an employee?

 4                  MS. SHARON POMERANZ:  No.  It's an agreement

 5        for services, just like my agreement with her for

 6        services.  You know, litigation funding has become very

 7        popular in the last couple of years, and so it's a common

 8        technique for lawyers to pursue claims, and it has been

 9        written about in many Bar journals and many publications.

10        So I'm sorry it's new to you.

11                  MS. ANNA INDAHL:  It's not new to me.

12                  MS. SHARON POMERANZ:  No, I don't think it

13        conflicts with IFP, but if the Court decides it does,

14        then we will withdraw, just like Nevada, which I guess is

15        what that attorney concluded.

16                  MS. ANNA INDAHL:  I don't think it --

17                  MS. SHARON POMERANZ:  You know, I understood

18        the IFP was based on her income, and that's what we

19        reported, was hers.

20                  MS. ANNA INDAHL:  What I'm trying to say is,

21        how is it fair, in your mind, that you can play fast and

22        loose, and get funding under the table, and do things

23        that the Court isn't aware of --

24                  MS. SHARON POMERANZ:  Under the table?

25                  MS. ANNA INDAHL:  Please let me finish my --
```

1          THE COURT REPORTER:  I can only write one at a

2     time.  If you would just all slow down, pause a little,

3     and give me time to write the Q and A, please.

4          MS. ANNA INDAHL:  My apologies.

5          THE COURT:  She was quicker than I was.  I was

6     going to say the same thing.

7          MS. ANNA INDAHL:  I was just trying to finish

8     my question.  My apologies.

9          How is it fair that you can play fast and loose

10     with funding, and get money under the table, apply for

11     IFP status, and not disclose that you're getting funding

12     for all of the fees through Litigation Management

13     Services?

14          MS. SHARON POMERANZ:  Because it was my

15     understanding that IFP was based on the income of the

16     individual plaintiff.

17          MS. ANNA INDAHL:  So if you hide the money in

18     another --

19          MS. SHARON POMERANZ:  I wasn't hiding the

20     money.

21          MS. ANNA INDAHL:  Can I please finish my

22     questions?  I let you finish your answers.

23          If you hide -- if you put the money in a

24     different location and it doesn't go direct deposit into

25     Ms. Carton's account, then you don't need to disclose

1     that to the Court?

2              MS. SHARON POMERANZ:  We disclosed Ms. Carton's

3     income, which was what was asked of us in the

4     application, and I did not feel I had to disclose

5     anything additional because that wasn't on the

6     application.  My agreement with litigation funding, I was

7     under the impression that that was an ethical, proper way

8     to represent indigent people.  That's what I had read.

9     That's what I had researched.  So we were following a

10    very legitimate model.

11             We're not a high-powered law firm like all of

12    you.

13             MS. ANNA INDAHL:  Oh.

14             MS. SHARON POMERANZ:  I mean, we're not.  She

15    is indigent, and I'm not with a firm, so we didn't have

16    the money.  She shouldn't be prevented from pursuing her

17    civil rights because of her indigency.

18             MS. ANNA INDAHL:  Nobody disputes that --

19             MS. SHARON POMERANZ:  That's what --

20             MS. ANNA INDAHL:  Please let me finish.

21             MS. SHARON POMERANZ:  Well, I'm answering your

22    question.

23             MS. ANNA INDAHL:  I haven't asked a question.

24             MS. SHARON POMERANZ:  I was answering your last

25    one.  That's why I thought it was fair.  You asked me why

1    I thought it was fair.  I think it's fair that poor

2    people should also have a chance to have access to the

3    system.

4              MS. ANNA INDAHL:  Ms. Pomeranz, that completely

5    mischaracterizes my question and it's not responsive to

6    anything I've asked, but I agree that indigent people

7    should have access to the legal system.

8              MS. SHARON POMERANZ:  That's my answer.

9              MS. ANNA INDAHL:  Have you received any funds

10   from Ms. Carton?

11             MS. SHARON POMERANZ:  No.

12             MS. ANNA INDAHL:  Have you received any monies

13   from Litigation Management Services?

14             MS. SHARON POMERANZ:  Yes.

15             MS. ANNA INDAHL:  How much?

16             MS. SHARON POMERANZ:  That's confidential in

17   our agreement.

18             MS. ANNA INDAHL:  Well, the agreement is going

19   to be produced to the Court, and I'll agree to a

20   protective order.

21             MS. SHARON POMERANZ:  Well, then, when it's

22   submitted to the Court, I guess it will have that

23   information.

24             MS. ANNA INDAHL:  Your Honor, can you compel

25   her to answer how much she has received from Litigation

1   Management Services?

2              THE COURT:  I need to look at the agreement

3   first.

4              MS. SHARON POMERANZ:  Yeah.

5              MS. ANNA INDAHL:  Is your payment per case?

6              MS. SHARON POMERANZ:  As I said, it's

7   confidential.  And it was -- it wasn't payment.  It was

8   to fund the litigation.  So there is a distinction.  And

9   that's where all of this confusion came from.

10             MS. ANNA INDAHL:  I'm not confused.

11             MS. SHARON POMERANZ:  Well, I'm saying from the

12  news and where this started, that Ms. Carton had been

13  paid.  It was all to fund the litigation, which is

14  certainly distinguishable from being paid.  We don't work

15  for anybody.

16             MS. ANNA INDAHL:  What costs have you incurred

17  and fees have you incurred so far in these cases?

18             MS. SHARON POMERANZ:  Well, we've incurred the

19  cost of the filings that have been paid, the ones that

20  the Judge read off earlier, as well as drafting, you

21  know, the service of process.  I think the Litigation

22  Management -- I'd have to ask Litigation Management

23  Company for an invoice, but all the things associated

24  with it, with the case.  We had to file.  We had to

25  serve.  They had to pay Ms. -- the theory with the money

1    that Ms. Carton received was that she would then use that

2    money to buy goods and services.  That was the model.

3            Because I wanted to make sure she had standing,

4    and it's a requirement that you intend to buy things, and

5    she didn't have the money to buy things.  That was the

6    intention of her payment.  It was not to pay her to

7    litigate.  And she answered that question.

8            So there was that expense of her actually

9    purchasing goods and services if she chose to; there was

10   the expense of the driver, the expense of the staff.

11           But I didn't -- the Litigation Company paid

12   those expenses.

13           MS. ANNA INDAHL:  Have you been paid in excess

14   -- have you been advanced any funds that haven't been

15   incurred in this case?

16           MS. SHARON POMERANZ:  No, absolutely not.

17           MS. ANNA INDAHL:  So you just invoice the

18   Litigation Management Services for the fees and the costs

19   that you have paid?

20           MS. SHARON POMERANZ:  Do I invoice them?

21   That's not the way we arrange it.

22           MS. ANNA INDAHL:  You mentioned an invoice,

23   that you have to get an invoice from them.

24           MS. SHARON POMERANZ:  No, I said they have

25   probably kept an invoice of all the people they have

1    paid.  I don't invoice them.  They pay the fees.  They

2    paid the filing fees to the court.  They paid the process

3    server.  They paid Ms. Carton.  So you would have to ask

4    them for a list of those fees.

5            MS. ANNA INDAHL:  So you haven't personally

6    received any money from Litigation Management Services?

7            MS. SHARON POMERANZ:  It's all been, as I

8    explained, not payment, but reimbursement for litigation

9    costs.

10           MS. ANNA INDAHL:  Okay.  Well, you said the

11   driver, that they paid directly; you said the court, that

12   they paid directly; you said Ms. Carton, that they paid

13   directly?

14           MS. SHARON POMERANZ:  Right.

15           MS. ANNA INDAHL:  So what have you had to pay,

16   that Litigation Management Services reimbursed to you?

17           MS. SHARON POMERANZ:  What did they pay me for?

18           MS. ANNA INDAHL:  That's my question.

19           MS. SHARON POMERANZ:  Well, as I said, that's

20   part of the agreement that's confidential and that has

21   yet to be determined by the Court.

22           MS. ANNA INDAHL:  But you have received money?

23           MS. SHARON POMERANZ:  I said I had.  Yes.  But

24   it's reimbursement.  It's not payment.

25           MS. ANNA INDAHL:  And so what's the

```
1    reimbursement for?  It's a simple question, and that's

2    not confidential.

3               MS. SHARON POMERANZ:  For litigation expenses.

4               MS. ANNA INDAHL:  Such as?

5               (Background noise.)

6               THE COURT:  Could the people on the phone

7    please mute your phones?  Thank you.

8               MS. SHARON POMERANZ:  I already answered.

9               MS. ANNA INDAHL:  No, you didn't.  You said --

10              MS. SHARON POMERANZ:  For the costs and the

11   filing fees.  That is my answer.

12              MS. ANNA INDAHL:  You said that they paid the

13   court directly for those.  I'm asking what they paid you

14   for?

15              MS. SHARON POMERANZ:  What they've paid me for?

16              MS. ANNA INDAHL:  Is there something wrong with

17   this mic?  Can you hear it?

18              MS. SHARON POMERANZ:  But I've already answered

19   that, that that's confidential, and the Court addressed

20   it and said when they see the agreement, they'll make a

21   decision.

22              MS. ANNA INDAHL:  That's not confidential, what

23   they paid you for.  The amount may be, and that's up to

24   the Court, but I'm not seeing --

25              MS. SHARON POMERANZ:  All the terms of that
```

```
1     agreement are confidential.

2               MS. ANNA INDAHL:  I'm asking something outside

3     the terms of the agreement, and --

4               MS. SHARON POMERANZ:  And I'm saying I'm

5     invoking my confidentiality --

6               THE COURT REPORTER:  Excuse me.  One at a time.

7     Wait a minute.  One at a time.  You're talking over one

8     another.  Wait for the question and the answer, please.

9               THE COURT:  I also want to ask you, why do you

10    consider this agreement that you have with this partner

11    in this litigation to be confidential?

12              MS. SHARON POMERANZ:  Because that's what is in

13    the terms of the agreement, because it's their work

14    product, all of this, you know, a lot of this.

15              THE COURT:  Evidently a lot of this is their

16    work product.

17              MS. SHARON POMERANZ:  A lot of the model and

18    the design and the funding was all created by the

19    management group, that's correct, and they are funded by

20    a very wealthy disabled person who wanted to make a

21    change, and so they have a good goal.  And if their model

22    is procedurally flawed somehow, that supports the

23    dismissal even more.

24              THE COURT:  Have you received portions of the

25    settlement monies that have been given in these cases?
```

1          MS. SHARON POMERANZ:  No, I have not received

2     settlement money, and neither has Ms. Carton.  She

3     misunderstood where the monies come from.  The money was

4     for her to go out and buy things at these premises so

5     that she would be -- have standing.  The settlement

6     monies go to the Litigation Management Company.

7          THE COURT:  The settlements go to the

8     management company, and not to your client?

9          MS. SHARON POMERANZ:  Right.  She is not

10    allowed to collect damages.  We remediate, and then they

11    cover their overhead if they can.  If not, then their

12    sponsor pays for it, you know, their person who's funding

13    them.  But I'm supposed to give them the settlement

14    money, and Ms. Carton understood that from the beginning,

15    and she was -- you know, everything was discussed with

16    her in our agreement, my agreement with her.  My retainer

17    agreement with her explains that I'll be using a

18    litigation company, and she knows that that's the model.

19         THE COURT:  How are you getting paid for your

20    legal services that you contend you provide?

21         MS. SHARON POMERANZ:  As I explained, we have

22    an agreement of how they pay me, and it's in the

23    confidential management service agreement that I have

24    with them.  And I take a very small -- this was not about

25    making money, as we said in the beginning, so I didn't

```
 1      get paid very much.

 2                    THE COURT:  All right.  I will look at that

 3      agreement and determine whether or not it should be

 4      considered confidential.  I'll also explore whether or

 5      not it should be produced pursuant to some kind of a

 6      protective order.

 7                    MS. SHARON POMERANZ:  I'm happy to turn it in.

 8      I am also happy to withdraw her IFP status if the Court

 9      finds that the Litigation Management agreement in and of

10      itself, even though it's not her income, precludes her

11      from being IFP.

12                    THE COURT:  And maybe I should explain that

13      your attorney has moved to dismiss all of your cases

14      with prejudice.  Do you understand what that means,

15      Ms. Carton?

16                    MS. ALYSSA CARTON:  With prejudice?  I don't

17      remember.  I'm sorry.  With prejudice.  I'm not sure if I

18      remember what that explanation was.  Can you repeat that

19      for me?

20                    THE COURT:  Yes.

21                    MS. ALYSSA CARTON:  Thank you.

22                    THE COURT:  To dismiss a case with prejudice

23      means that you will be giving up all claims that you

24      brought or could have brought in any of these lawsuits.

25                    MS. ALYSSA CARTON:  Uh-huh.
```

```
 1              THE COURT:  Do you understand that?
 2              MS. ALYSSA CARTON:  I guess I do now, yes.
 3              THE COURT:  All right.  And that request has
 4      been made, and it will be my recommendation to Chief
 5      Judge Armijo to do so.  However, there is another issue,
 6      and that is the request that that dismissal be
 7      conditioned upon payment of defendants' attorney fees
 8      that have been incurred in defending these lawsuits.
 9              MS. ALYSSA CARTON:  Uh-huh.
10              THE COURT:  Also, I have concerns about whether
11      sanctions should be imposed.  Those sanctions at this
12      time I don't see going against you.  However, Ms.
13      Pomeranz, I need to advise you that I have concerns with
14      regard to testimony that you gave at the previous
15      hearing.  I have concerns with how this litigation has
16      been managed by an undisclosed, until these hearings,
17      organization, and it's presumed, or at least it appears,
18      past ties to a different organization, AID, which has
19      been sanctioned and has been investigated by other State
20      Attorney Generals' offices.
21              And so I need to advise you that I am also
22      considering whether I should recommend to Chief Judge
23      Armijo that sanctions be imposed pursuant to 28 U.S.C.
24      Section 1927.  Those sanctions may be awarded when an
25      attorney is cavalier or bent on misleading the Court,
```

```
 1    intending acts without a plausible basis or when the

 2    entire course of proceedings was unwarranted.

 3            Those are some of my concerns that I'm looking

 4    at, and I need to make sure that you understand you do

 5    have an opportunity to respond to my consideration of

 6    that.  That's your due process right.

 7            But also, again, we have a lot of defendants

 8    who have had to incur fees and costs in defending these

 9    actions.

10            I also am concerned about deterring any future

11    kinds of litigation under the model that has been

12    expressed by Ms. Pomeranz and by you here today.  It has

13    created a great deal of angst to these businesses.

14            MS. ALYSSA CARTON:  Yes.  That's a good word.

15            THE COURT:  Yes.  Also, this kind of litigation

16    undermines the purposes of the ADA, because we want --

17    it's a wonderful statute.  It's a necessary statute, and

18    businesses should be required to comply with preventing

19    barriers to those who are disabled.

20            MS. ALYSSA CARTON:  Uh-huh.

21            THE COURT:  But these kinds of lawsuits tend to

22    create an impression of coercive lawsuits, intended to

23    get attorneys' fees, to get money where money is

24    otherwise not available, damages are not available, but

25    settlements, through demands for settlements, money
```

1    changes hands.

2           And businesses cannot afford, oftentimes, to

3    defend a lawsuit like this.  It's going to cost them more

4    to defend than it is to settle a case.

5           Also, in these documents that were presented or

6    filed yesterday by Ms. Indahl, the settlement demands

7    that have been made, Ms. Pomeranz represented to me were

8    very small amounts.  That's not what I'm seeing.  I'm

9    seeing demands for close to $3,000 to $7,500.

10          I'm looking at what has been filed, the

11   drafting that Ms. Pomeranz indicates that she performed.

12   They're pretty much cut-and-paste from the boilerplate

13   that appears to have been primarily created by this

14   litigation company in association with cases that were

15   previously filed in Colorado and other forums.

16          So that's my concern.  All right.

17          Ms. Indahl, if you want to continue?

18          MS. ANNA INDAHL:  Thank you.

19          MS. SHARON POMERANZ:  Would you like me to

20   respond in writing to that, Judge?

21          THE COURT:  I think probably so, after you've

22   had a chance to think it over and see how you want to

23   respond.

24          MS. SHARON POMERANZ:  Did you want to respond?

25          MS. ALYSSA CARTON:  Actually, I wanted to ask a

1    question.  Earlier, you mentioned something about if I

2    needed a break or whatever.

3              THE COURT:  Yes.

4              MS. ALYSSA CARTON:  I need a few minutes to go

5    use the restroom.  And I would love to come back and, you

6    know, be happy to listen to whatever else needs to be

7    addressed in the courtroom, but I do need a few minutes,

8    maybe about 15 minutes to go use the restroom.

9              THE COURT:  All right.  Let's reconvene at

10   12:00, then, and we'll be back at that time.

11             MS. ALYSSA CARTON:  Thank you, Judge.  Thank

12   you.

13             LAW CLERK JEFFRIE MINIER:  All rise.

14             (Recess from 11:44 a.m until 11:58 a.m.)

15             LAW CLERK JEFFRIE MINIER:  All rise.

16             THE COURT:  Everyone, please be seated.  And

17   you can continue, Ms. Indahl.

18             MS. ANNA INDAHL:  Thank you, Your Honor.

19             Ms. Pomeranz, just a couple of questions, and

20   then I'd like to ask Ms. Carton some questions as well.

21   You testified earlier that you work with Alex Callan with

22   Litigation Management Services; is that right?

23             MS. SHARON POMERANZ:  That I -- he is an

24   attorney who works for Litigation Management Company.  He

25   was on the team, yes.

```
 1              MS. ANNA INDAHL:  I'm sorry.  You said he was
 2      on your team?
 3              MS. SHARON POMERANZ:  He works for Litigation
 4      Management Company, but we worked together in developing
 5      this model that we've now discovered has issues, thanks
 6      to the Court for pointing it out, you know, that we've
 7      really been able through this hearing to discover, Your
 8      Honor, and I'm glad the Court has made us aware that even
 9      though she had found some very solid violations, that she
10      should have disclosed to the Court the source of her
11      funds, that she had this opportunity for funding.
12              And we realize that we should have made the
13      Court aware of that earlier.  I didn't -- I didn't think
14      that would impact her status, and that was my error.
15              MS. ANNA INDAHL:  So my question is:  Is Alex
16      Callan on your team?
17              MS. SHARON POMERANZ:  Is he on my team?  I've
18      answered your question.  He works for Litigation
19      Management Company.
20              MS. ANNA INDAHL:  Has he worked on these cases?
21              MS. SHARON POMERANZ:  He has worked on these
22      cases through his role as the director of Litigation
23      Management Company.
24              MS. ANNA INDAHL:  Are you aware that he is
25      listed in the Arizona corporate website as the registered
```

 1    agent for AID?

 2              MS. SHARON POMERANZ:  I did not know he was

 3    connected to AID until recently, when all of these court

 4    proceedings began.  We didn't know that until all of this

 5    stuff came out.

 6              MS. ANNA INDAHL:  Can you tell me what you

 7    mean?  When you filed your lawsuits?

 8              MS. SHARON POMERANZ:  No, last week, when we

 9    were in court and people started asking about AID and

10    their connection, and then you sent me information

11    connecting them.  That's how I found out.  I did not

12    check the Arizona website because Litigation Management

13    Company is not registered in Arizona, so I never

14    contacted the Secretary of State of Arizona.  The

15    company, I believe, is in -- it's -- I don't know if it

16    was Delaware or another midwestern state that they

17    incorporated in, but they were not --

18              MS. ALYSSA CARTON:  I would like to add, too,

19    that I don't know if we're speaking of the same Alex.  I

20    know I mentioned an Alex earlier.  I don't think that was

21    the last name of the Alex that I mentioned, so I'm not

22    sure if there's a different Alex at play here.

23              MS. ANNA INDAHL:  Okay.  Are you aware, Ms.

24    Pomeranz, that Alex Callan is also chairman of the board

25    for AID on the Arizona corporate website?

1          MS. SHARON POMERANZ:  As I stated, I had no

2     idea of his involvement with any group outside of

3     Litigation Management Company.  They were the only

4     company I looked into.  I didn't know his connection.  I

5     didn't know that he had ever worked for AID, or does work

6     for AID, or is on their board.  I had no knowledge of any

7     connection between this other group.  And now that I

8     know, it certainly makes me take note.

9          THE COURT:  Let me interrupt for a second.  How

10    did you get connected to Litigation Management Services?

11    Did you contact them, or did they contact you?

12         MS. SHARON POMERANZ:  I answered an ad for

13    civil rights attorneys on Indeed.

14         THE COURT:  And when was that?

15         MS. SHARON POMERANZ:  In the summer, summer of

16    2016.  I don't remember.  Towards the late summer.

17         THE COURT:  And it was listed as Litigation

18    Management Services?

19         MS. SHARON POMERANZ:  It didn't -- it didn't

20    list a name of a company.  It just said "Civil Rights

21    Attorneys Wanted," and I applied through the Indeed

22    website.  And months went by and I didn't get any

23    contact, and then somebody called me after several months

24    and said they were from Litigation Management.

25         THE COURT:  All right.  Thank you.

1          MS. ANNA INDAHL:  So after you said that you

2     became aware that there could be a connection with AID

3     and Litigation Management Services, did you do any

4     investigation?

5          MS. SHARON POMERANZ:  Well, we had already

6     asked to dismiss the cases, and so no.  We had already

7     had our position to the Court when we came.  When I came

8     here last week and Ms. Carton was not here, she had

9     already told me she wanted to dismiss the cases, and

10    that's what I told the Court.  And that is still what

11    we're telling the Court.

12         So I didn't look into AID because they have no

13    bearing or relevance to our decision to dismiss or why we

14    filed the cases in the first place, which was as a civil

15    rights action.

16         MS. ANNA INDAHL:  What research did you do into

17    Litigation Management Services?  You said you checked

18    that they were in good standing.  What state are they in

19    good standing in?

20         MS. SHARON POMERANZ:  I can't remember.  It was

21    either Delaware or one of the midwestern states.  I would

22    have to check my records.  But I know specifically it was

23    not Arizona.

24         MS. ANNA INDAHL:  So how did you do that

25    search?  Because as I understand it, you would need to go

1    to that state and search for a corporation.  Did you

2    search all 50 states?

3              MS. SHARON POMERANZ:  No.  They told me which

4    state they were registered in, and I checked that state.

5    I just don't recall it here today.  I just recall it was

6    not Arizona.  But I did ask to do my due diligence before

7    entering a service agreement with them.  I did ask to

8    make sure they were in good standing in the state they

9    were registered in, which was provided to me.

10             MS. ANNA INDAHL:  By whom?

11             MS. SHARON POMERANZ:  Does that answer your

12   question?

13             MS. ANNA INDAHL:  Yes.  A follow-up question:

14   By whom was it represented to you?

15             MS. SHARON POMERANZ:  By whom was what

16   represented?

17             MS. ANNA INDAHL:  That they were in good

18   standing.

19             MS. SHARON POMERANZ:  I checked, myself.  It

20   wasn't represented to me.  I asked to do due diligence,

21   and they said, "We're incorporated in this state."  And I

22   went and looked if they were in good standing, and the

23   website indicated they were.

24             MS. ANNA INDAHL:  My question is simple.  Who

25   told you they were in good standing?

```
1              MS. SHARON POMERANZ:  The Secretary of State's

2       website.

3              MS. ANNA INDAHL:  I think we're confused here,

4       because you said that it was represented to you that they

5       were in good standing.

6              MS. SHARON POMERANZ:  By the -- by my own

7       checking on the website, that was what it said.  They

8       were in good standing.

9              MS. ANNA INDAHL:  So you searched every, all 50

10      states' websites?

11             MS. SHARON POMERANZ:  I've answered this.  They

12      told me which state --

13             THE COURT:  I want you both to calm down.

14             MS. SHARON POMERANZ:  Okay.

15             THE COURT:  And I want to make a clear record,

16      and Julie would like you to have a clear record, so if

17      you could please tone it down.  Just ask the questions,

18      answer the questions.

19             MS. SHARON POMERANZ:  What is your question?

20             MS. ANNA INDAHL:  Let me know if I'm confused,

21      but my understanding is that you just said that you were

22      told by somebody at Litigation Management Services that

23      they were in good standing in a state.

24             MS. SHARON POMERANZ:  What I said was, I did my

25      due diligence, and I checked on their standing and found
```

1       they were in good standing in the state they're

2       registered in, which I cannot recall.  I didn't check 50

3       states.  They told me back in the summer which state it

4       was, and I don't remember.  It was either Delaware or

5       another state.  I don't recall.

6                   MS. ANNA INDAHL:  What I want you to focus on

7       is --

8                   MS. SHARON POMERANZ:  Sorry.  Yeah.

9                   MS. ANNA INDAHL:  The bit you just said, "They

10      told me back in the summer that they were in good

11      standing," I'm interested in who told --

12                  MS. SHARON POMERANZ:  What do you mean "they"?

13      I'm all confused by her questions, Judge.

14                  THE COURT:  Let me ask it, then.

15                  MS. SHARON POMERANZ:  Yes, please.

16                  THE COURT:  Who told you which state they were

17      registered in?

18                  MS. SHARON POMERANZ:  Alex Callan told me which

19      state.  Either Alex or Craig.  I can't recall, actually,

20      because I was talking to both of them.  But I did do my

21      diligence.  What I didn't understand was that it impacted

22      her IFP status.

23                  THE COURT:  All right.

24                  MS. SHARON POMERANZ:  That is where I went

25      wrong in this matter, Judge, not in my investigation of

```
 1        the litigation company.

 2                    THE COURT:  All right.  Ms. Indahl?

 3                    MS. ANNA INDAHL:  Thank you, Your Honor.  Sorry

 4        for the confusion.  I don't mean to be confusing, so I

 5        apologize if I was.

 6                    Ms. Carton?

 7                    MS. ALYSSA CARTON:  Yes?

 8                    MS. ANNA INDAHL:  Some questions for you.

 9                    MS. ALYSSA CARTON:  Yes.  Sorry.  Let me get

10        the microphone closer to me so I can actually answer you.

11                    MS. ANNA INDAHL:  And I know we've talked a lot

12        about your interest in advocating for individuals with

13        disabilities and for improving access to businesses for

14        individuals with disabilities.

15                    MS. ALYSSA CARTON:  Uh-huh.

16                    MS. ANNA INDAHL:  Before bringing any of these

17        lawsuits, what was your motivation in bringing these

18        lawsuits?

19                    MS. ALYSSA CARTON:  I think it's self-

20        explanatory.  I wanted to make things more accessible for

21        people like me and for myself.

22                    MS. ANNA INDAHL:  Was that your only goal?

23                    MS. ALYSSA CARTON:  Yeah.

24                    MS. ANNA INDAHL:  Did you want to punish these

25        businesses at all?
```

1          MS. ALYSSA CARTON:  No.

2          MS. ANNA INDAHL:  Why didn't you simply write

3     to them and request remediation before filing your

4     lawsuits?

5          MS. ALYSSA CARTON:  Well, like I said earlier,

6     there was a point where I talked to the team that was

7     available to me at the time.  I mentioned I thought that

8     was a good idea, and it sounded like they were going to

9     do that.  And then when I found out that they didn't do

10    that, I knew there was going to be a problem, so I

11    suggested it, but I did not do that myself.  That's where

12    I went wrong.

13         MS. ANNA INDAHL:  Did you talk to Ms. Pomeranz

14    about that strategy?

15         MS. ALYSSA CARTON:  Yes, I did.

16         MS. ANNA INDAHL:  And what did she say?

17         MS. ALYSSA CARTON:  I don't remember at this

18    time.

19         MS. ANNA INDAHL:  Did you talk to her once you

20    realized that the letters hadn't been sent out prior to

21    the lawsuits being filed?

22         MS. ALYSSA CARTON:  Yes.

23         MS. ANNA INDAHL:  And what was that

24    conversation?

25         MS. ALYSSA CARTON:  Basically, that we were

1    going to have a problem with some of these cases because

2    people would be upset.

3              MS. ANNA INDAHL:  Who said that?

4              MS. ALYSSA CARTON:  I said that.  I said that

5    people are going to be upset when -- by the fact that we

6    did not approach them correctly and, you know, what do we

7    do?

8              MS. ANNA INDAHL:  Why do you think people were

9    upset?

10             MS. ALYSSA CARTON:  Because we didn't go in and

11   say, "Hey, you've got a violation.  You know, I'll give

12   you two weeks, or whatever, a certain time frame, to make

13   the change before we sue."

14             MS. ANNA INDAHL:  Do you think -- I mean, do

15   you feel that that feeling is reasonable?

16             MS. ALYSSA CARTON:  I think that feeling is

17   reasonable.  I have been in situations where I've gone

18   into restaurants, or whatever.  I remember a restaurant,

19   years ago, I went into a restaurant, and even a bowling

20   alley -- I don't remember which one.  I went and I

21   confronted, you know, violations that I saw at the time,

22   without a lawyer, without anybody helping me or whatever,

23   and it took six months for someone to respond to me.  So

24   at that point in time, I was kind of like, well, maybe I

25   should just go ahead and sue.

1          But that was years ago, so I think my anger

2     subsided, and I just was willing to try this out this way

3     or -- you know, just to use a lawyer.  That's what I

4     mean.

5          And so, yeah, I just -- I forgot where I was

6     going with that.  I'm sorry.  But yes, essentially, you

7     know, I tried -- I've tried it without a lawyer and I've

8     tried it with a lawyer.  You know, I didn't get very far

9     without a lawyer because it took six months, and I got

10    frustrated and I realized that people don't care, you

11    know.  They'll hear me, whatever, and they just don't

12    care.  Sometimes people just don't care, you know, and

13    they think I had need to be more specific.

14         You know, obviously using a lawyer made me feel

15    like I was going to be a little bit more specific, you

16    know, saying, "Hey, make this change.  You know, make

17    this or we have the right to sue."

18         And so that was my belief, that using a lawyer

19    would give me the opportunity to be more clear about my

20    rights and my intent with, you know, violations that I

21    noticed, is that I have the power to sue you; I will sue

22    you; I don't have any reason to back down.

23         But obviously, now on this side of the

24    situation, I've included too many people in these cases

25    and, you know, too many opinions, you know, affected the

1    way things got handled or whatever.  And it just seems

2    like, you know, people were content to abuse these

3    businesses and make them feel, you know, like they didn't

4    have the right to be treated fairly and justly and, you

5    know, give enough freedom of time, you know, that time

6    frame to make the change before they were legally sued.

7              So that's -- I hope that answers your question.

8              MS. ANNA INDAHL:  It does.  Do you feel like

9    these businesses were abused by this litigation?

10             MS. ALYSSA CARTON:  I do.  I absolutely do.  I

11   think it's totally inappropriate to go into a business

12   and demand changes without proper course, if that's the

13   right legal word.  I'm sorry.  I don't really know what

14   I'm talking about in that regard.

15             But, yeah, I do.  I think this was a complete

16   abuse of power, and I think that, you know, in hindsight

17   -- well, I'm not the one -- I'm not the one that did

18   that.  You know, I participated but, you know, I wasn't

19   in control of that.  So my personal opinion is, I won't

20   be using situations like this ever again because, you

21   know, it just damaged a lot of situations that, you know,

22   benefited me and benefited these businesses.

23             It's ridiculous.  I'm ashamed.

24             MS. ANNA INDAHL:  I'm sorry to hear that.

25             MS. ALYSSA CARTON:  Yes.  Definitely, I'm

1    ashamed to be part of this.  This is awful.

2             MS. ANNA INDAHL:  We've been talking a little

3    bit about the news interview that you gave, but I don't

4    know if you saw it.

5             MS. ALYSSA CARTON:  I think there were two.  I

6    don't remember which.  I did two interviews.  I don't

7    really know what was broadcasted in both of them.

8             MS. ANNA INDAHL:  Are the things that you said

9    true, as you sit here today?  The things that you said,

10   not what was reported by the news and things maybe other

11   people said, but I'm talking about what you specifically

12   said.  Were those things true?

13            MS. ALYSSA CARTON:  Everything that I've

14   reported is true.  I know that I -- I believe that

15   talking to the news at the time was probably not an

16   appropriate way of handling my feeling because I was not

17   -- I was not -- I didn't prepare.  I did not write out my

18   thoughts in a constructive way so that I could

19   communicate, you know, assertively and calmly what I felt

20   and what was going on, so that I would deliver accurate

21   information.  And I think that created a lot of chaos,

22   and I think that a lot of people had a lot of different

23   feelings about it, myself included.  And, you know,

24   that's not something I want to participate in, in the

25   future.  I don't -- I don't want to do that.

1          MS. ANNA INDAHL:  Understood.  Can you think of

2     anything, though, that you said that wasn't true?  Even

3     if it was somewhat disorganized, was it all true what you

4     said?

5               THE COURT:  On what occasion?

6          MS. ANNA INDAHL:  On the news.

7          MS. ALYSSA CARTON:  I think what you're

8     referring to is that I might have participated with AID.

9     I think there might have been -- that I might have

10    somehow made a connection with AID.  I don't know if

11    that's what you're referring to.  Is that what you're

12    referring to?

13              MS. ANNA INDAHL:  Not particularly.  I'm just

14    wondering if everything that you've said is true, not

15    with any particular point in mind.

16              THE COURT:  Are you saying here, today, in

17    court?

18              MS. ANNA INDAHL:  I'm sorry.  Here, today, in

19    court, I'm assuming that because she's under oath, it's

20    true.

21              What I'm asking, and I apologize if it's a poor

22    question:  Was the interview that you gave to the news

23    outside of court true?

24              MS. ALYSSA CARTON:  The interview I gave was

25    disorganized and it was not something that I am proud of.

1     It's not -- you know, I don't think I gave a clear

2     representation of what I was dealing with at the time.

3             MS. ANNA INDAHL:  So putting aside the lack of

4     clarity or organization, was anything untrue about those

5     statements that the news got from you?

6             MS. ALYSSA CARTON:  I don't think -- I don't

7     know if there's a difference between what you're asking

8     now or what you were asking earlier.  I'm sorry.

9             THE COURT:  Do you want to be more specific?

10            MS. ANNA INDAHL:  Did you get $50 per case?  I

11    mean, you said that on the news.  Or per violation or per

12    test?  I mean, however you want to categorize it, did you

13    get some form of money per individual incident?

14            MS. SHARON POMERANZ:  I'm sorry.  She has

15    already disclosed to the Court that she got $5,000 for

16    litigation expenses.  It's in an affidavit that has been

17    disclosed.

18            MS. ANNA INDAHL:  The Court asked me to ask a

19    specific question as to her news interview, and that's

20    one of them.  I'm just wondering if there are any

21    inaccuracies in what she told the news.

22            THE COURT:  I think the question is very

23    specific.

24            MS. ALYSSA CARTON:  Okay.

25            THE COURT:  Evidently, in your discussion with

1    a reporter, you indicated that you were paid $50 per

2    case.

3              MS. ALYSSA CARTON:  Yes, I do remember saying

4    that, and I don't recall whether that's true or not at

5    this point in time.  I don't think it is.

6              THE COURT:  What would lead you to think it

7    might not be true?

8              MS. ALYSSA CARTON:  Well, I went out and I

9    purchased certain things at locations.  There was an

10   incident or a situation where a driver bought me some

11   items, as well, when I was out, and I think that added up

12   to $50, and so I might have pulled the number from that,

13   as well.  But that's all I can think of at this time.

14             Does that answer?  Does that help or...

15             THE COURT:  I'm just wondering, why did you say

16   you were paid $50 per case?

17             MS. ALYSSA CARTON:  I said that because I felt

18   threatened, and I said it because people were attacking

19   me because, you know, people who sue businesses, you

20   know, or end up in lawsuits do end up with monetary --

21   what's the word?  I don't know what I'm looking for, but

22   you know...

23             THE COURT:  So was that untrue?

24             MS. ALYSSA CARTON:  No.  Well, yes, actually.

25   I'm sorry.  I'm really stressed out.  I'm tired.  I'm

1     hungry, actually, so I apologize.  I hope that helps.

2     Does that answer your question?

3                 MS. ANNA INDAHL:  Yeah, it does.  Thanks.

4                 MS. ALYSSA CARTON:  Thank you.

5                 MS. ANNA INDAHL:  So you said that you thought

6     these cases were abusive.  Do you think they were brought

7     with malice, looking back, as you sit here today?

8                 MS. ALYSSA CARTON:  I would say so.  I don't

9     know if I would say all of them, but maybe I would.  I'm

10    sitting here, trying to remember all of them.  You know

11    what I mean?  We all -- I went into each location, and I

12    did not give them the proper amount of time to address

13    the suits, so I guess if that is malicious, then I would

14    have to agree with that.

15                You know, there are other things that were

16    done, you know, that I don't think were malicious, and so

17    I would hope that the Court would give me a break on

18    that.  But, you know, it's up to the Court, and I totally

19    respect the choices and the decisions of the courtroom in

20    regards to these cases.

21                MS. ANNA INDAHL:  Okay.  If the Court decides

22    to award attorneys' fees to the defendants who have paid

23    to defend these cases, who do you think should pay those

24    fees?

25                MS. ALYSSA CARTON:  I -- I'd have to look at my

```
 1    contract.  I mean, you know, I guess the team of people
 2    that put them together, whether that's Ms. Pomeranz or
 3    the litigation team, the people that helped her.  I mean,
 4    I'm not really clear on how that's worded, but I'm -- you
 5    know, I would hope that they would -- sorry.  I would
 6    hope that they would be held responsible for the
 7    situation.  It seems like they caused her a lot of grief,
 8    as well.
 9            You know, she's doing the best she can, and I'm
10    doing the best I can.  And, you know, it seems like
11    there's a lot of deceit going on with those people,
12    whoever they are, wherever they are, and so I would hope
13    that they are held responsible.
14            MS. ANNA INDAHL:  Just a couple more questions.
15    Before these complaints were filed, did you review them
16    at all?
17            MS. ALYSSA CARTON:  I think I might have, but
18    in a very vague way.  Like I didn't see any papers.  I
19    think there was just mention of it.  And so it was not
20    something that I had in my mind in a very concrete -- I
21    didn't have a concrete picture of what was going on,
22    because usually I need to be able to see something like
23    we saw earlier with the photos.  As soon as I see a
24    photo, "Oh, I recognize that person.  I know that
25    person's name."
```

1          So, you know, with these cases, you know, if I

2    had seen the picture or seen the written version of what

3    the cases looked like, you know, I would be able to --

4    I'd have a better understanding of, you know, what was

5    going on.

6          MS. ANNA INDAHL:  So for each case, in

7    Paragraph 31, I'll just represent to you, it listed the

8    particular barriers you allegedly experienced.

9          MS. ALYSSA CARTON:  Uh-huh.

10          MS. ANNA INDAHL:  Did you review those to see

11    if they were accurate?

12          MS. ALYSSA CARTON:  Not -- not by looking at a

13    paper.  Not by looking at the actual written document.

14    But I did talk to the team at the time and say, "Yes, I

15    saw this."  I mean, we had pictures of, you know, the

16    barriers, and I was aware of the pictures.  I went back

17    to the locations and saw the barriers, myself.  Somebody

18    witnessed me going back to those, you know, all those

19    locations so that, you know, everything was legit.  And

20    so that's how that worked out.

21          But I didn't actually see a document at the

22    time.

23          MS. ANNA INDAHL:  Were you made aware of the

24    settlement demands that were presented to various

25    defendants by your attorney in this case or by Litigation

1     Management Services?

2              MS. ALYSSA CARTON:  No, I was not made aware of

3     that.  I mean, I might have heard something, but it

4     didn't -- I wasn't sure if that was accurate, and I

5     didn't talk to her, talk to Sharon about that.

6              MS. ANNA INDAHL:  So you never gave authority

7     for those offers?

8              MS. ALYSSA CARTON:  No.

9              MS. ANNA INDAHL:  Are you aware of how much

10    they were for?

11             MS. ALYSSA CARTON:  I'm not aware of any of the

12    financial aspect of these cases.

13             MS. ANNA INDAHL:  Have you shared your

14    Litigation Management Services contract with anybody,

15    over e-mail or otherwise?

16             MS. ALYSSA CARTON:  I shared it with my mother.

17             MS. ANNA INDAHL:  Okay.

18             MS. ALYSSA CARTON:  I shared it with -- well,

19    she already knew about it, but I sent it back to her

20    because I wanted her to read it to me.  Does that answer

21    your question?

22             MS. ANNA INDAHL:  In part.  Anybody else?

23             MS. ALYSSA CARTON:  Well, I don't remember.  I

24    don't --

25             MS. ANNA INDAHL:  Did you e-mail it to a

1    reporter in Arizona?

2              MS. ALYSSA CARTON:  I don't remember.  I might

3    have.  I don't remember.

4              MS. ANNA INDAHL:  With regard to the statement

5    that you read at the beginning of this hearing, did you

6    prepare that?

7              MS. ALYSSA CARTON:  Yes, I did.

8              MS. ANNA INDAHL:  Alone?

9              MS. ALYSSA CARTON:  My mother helped me.  I

10   mean, we talked about it.  She knew what I was going to

11   say.  That's all.

12             MS. ANNA INDAHL:  Was Litigation Management

13   Services involved in that statement?

14             MS. ALYSSA CARTON:  No.

15             MS. ANNA INDAHL:  I don't have any other

16   questions, but I do have a request of the Court, if we

17   could have an order that would preserve all

18   correspondence with Litigation Management Services to the

19   extent an attorneys' fees motion is deemed necessary, if

20   the Court would consider that, because we would need to

21   do limited discovery as far as issues that would relate

22   to that correspondence with Ms. Pomeranz and Ms. Carton,

23   and also with individuals that have been listed as part

24   of this team that may be AID or may be Litigation

25   Management Services.

1              THE COURT:  Yes.  So I'm going to order a

2      preservation of all correspondence or contacts, any of

3      that related to this case.

4              MS. ALYSSA CARTON:  Can you explain that to me

5      a little bit more?

6              THE COURT:  Sure.  It means that any

7      correspondence that you have, any letters, any e-mails,

8      any text messages, any communications that you have had

9      with Ms. Pomeranz or others --

10             MS. ALYSSA CARTON:  Uh-huh.

11             THE COURT:  -- pretty much anyone, I want you

12     to save all of those communications.

13             MS. ALYSSA CARTON:  Do you want me to print

14     them out?

15             THE COURT:  I think right now, you can just

16     save them.  However, if there are any on your cellphone,

17     make sure that they will not be automatically deleted

18     after a certain time period.

19             MS. ALYSSA CARTON:  Sure.  Well, the reason I'm

20     asking you is because I only have a cellphone.  I mean,

21     my primary way of dealing with e-mail is through my

22     phone, so if you want me to go ahead and print them out

23     for you, I can do that.

24             THE COURT:  That would be fine.  Why don't you

25     do that.

1           MS. ALYSSA CARTON:  I just want to make sure I

2     understand what you need so I can cooperate with the

3     Court.

4           THE COURT:  All right.  Ms. Carton, if you'd do

5     that, that might make it simpler.  Okay?

6           MS. ALYSSA CARTON:  Okay.

7           THE COURT:  But I do want you to check your

8     settings to make sure that you don't have it so that it's

9     automatically going to delete any communications.

10          MS. ALYSSA CARTON:  Okay.

11          THE COURT:  Okay?

12          MS. ALYSSA CARTON:  Yes.  And do I need to talk

13    to somebody specific about how to do that?  I don't know

14    who to ask to help me make sure that that is the way that

15    you're asking.

16          THE COURT:  Probably your cellphone carrier.

17          MS. ALYSSA CARTON:  Oh, okay.  Now I know what

18    you're talking about.

19          THE COURT:  But I think what you can do is --

20    I'm pretending I'm tech savvy here, but there's generally

21    a settings.  Is it an Iphone that you have?

22          MS. ALYSSA CARTON:  I have an Android phone.

23    It's a piece of garbage, in my opinion.

24          THE COURT:  There generally is a settings.

25          MS. ALYSSA CARTON:  Right.  Okay.  So I can go

1          over to my carrier and tell them that you guys need my

2          e-mails from my account.

3                    THE COURT:  Preserved.

4                    MS. ALYSSA CARTON:  Preserved.  And then I ask

5          them to help me do that?

6                    THE COURT:  Yes.

7                    MS. ALYSSA CARTON:  Is that what you're asking?

8                    THE COURT:  That's what I'm suggesting.

9                    MS. ALYSSA CARTON:  Got it.

10                    THE COURT:  Okay.

11                    MS. ALYSSA CARTON:  I will do that.  Thank you.

12                    THE COURT:  All right.  Mr. Reid?

13                    MR. SPENCER REID:  Thank you, Your Honor.

14                    My name is Spencer Reid.  I represent New

15          Mexico Bank & Trust.

16                    MS. ALYSSA CARTON:  Hi.

17                    MR. SPENCER REID:  Hi.  I think Ms. Indahl has

18          done a fine job and covered almost everything that I was

19          going to cover, but I do want to touch again back on that

20          interview where you told the TV reporter that you were

21          paid $50 per complaint.

22                    MS. ALYSSA CARTON:  Sure.

23                    MR. SPENCER REID:  And I'm not trying to put

24          words in your mouth.

25                    MS. ALYSSA CARTON:  Oh, sure.  You know, I

1    haven't seen the interview in a day or two, so I'm kind

2    of like, what should I say?

3            MR. SPENCER REID:  Well, that seemed to make

4    sense to me, you know, because when I did watch it --

5            MS. ALYSSA CARTON:  Yeah.

6            MR. SPENCER REID:  -- because I understand you

7    filed 100 suits; is that correct?

8            MS. ALYSSA CARTON:  I did file 100 suits.

9            MR. SPENCER REID:  And at $50 --

10           MS. ALYSSA CARTON:  I think I filed more.  But

11   anyway, I don't remember.  Go ahead.

12           MR. SPENCER REID:  And at $50 per suit for 100

13   suits is $5,000?

14           MS. ALYSSA CARTON:  That makes some sense, so

15   it might be how that number comes out, yeah.  I hadn't

16   done the math.  I'm sorry.

17           MR. SPENCER REID:  Does that refresh your

18   recollection?

19           MS. ALYSSA CARTON:  It does refresh, yeah.

20           THE COURT:  And I believe reference has been

21   made to you receiving $5,000?

22           MS. ALYSSA CARTON:  There has been some

23   reference, and that's kind of why I've gotten confused,

24   because I made that reference earlier and I didn't know

25   if that answered the question completely.  And so I'm

1    glad that he's asking this in this fashion so that it

2    closes that issue, it sounds like.

3              THE COURT:  Litigation Management Services gave

4    you a check for $5,000?

5              MS. ALYSSA CARTON:  I'm not sure if it -- it

6    was direct deposited, so I'm not really sure if it was in

7    a $5,000 chunk or if it went in smaller chunks.

8              THE COURT:  I'm not trying to pin you down.

9              MS. ALYSSA CARTON:  Oh, sorry.

10             THE COURT:  Was it $5,000 exactly?

11             MS. ALYSSA CARTON:  I'm assuming it was $5,000

12   exactly, but I don't have my documents in front of me.

13   I'm sorry, Judge.

14             THE COURT:  Okay.  Thank you.

15             MR. SPENCER REID:  And into what bank account

16   -- not the number, but the name of the bank.  Into what

17   bank account was the money deposited?

18             MS. ALYSSA CARTON:  Oh, Sandia Laboratory.  I

19   don't remember.  I mean, because I have -- I don't know.

20             MR. SPENCER REID:  You don't know where you

21   bank?

22             MS. ALYSSA CARTON:  No, I have a trust fund,

23   and it was deposited into my trust fund.

24             MR. SPENCER REID:  And who is your trustee?

25             MS. ALYSSA CARTON:  My sister.

1          MR. SPENCER REID:  You don't have a corporate

2     or a banking trustee who looks after your finances?

3          MS. ALYSSA CARTON:  My mom.  Do you want to

4     help me?  I'm so sorry to pull you into this garbage.

5          MRS. RUE CARTON:  I balance her checkbook.

6          MR. SPENCER REID:  At what bank, if I may ask?

7          MRS. RUE CARTON:  The trust at Sandia National

8     Labs.

9          MS. ALYSSA CARTON:  Oh, there you go.  I knew

10    it was Sandia something.  I'm sorry.

11         MR. SPENCER REID:  A number -- quite a number

12    of the suits filed concerned the precise height of

13    parking.

14         MS. ALYSSA CARTON:  Yes.

15         MR. SPENCER REID:  And you made some comment

16    about that earlier, and I just want to clarify for my

17    understanding.

18         MS. ALYSSA CARTON:  Uh-huh.

19         MR. SPENCER REID:  I thought you said something

20    to the effect that if it's just a parking sign claim,

21    that you didn't attempt to go into the building.  Did I

22    understand that correctly?

23         MS. ALYSSA CARTON:  I do believe I said that,

24    yes.

25         MR. SPENCER REID:  Okay.  And that's true to

1    the best of your knowledge?

2              MS. ALYSSA CARTON:  Yes.  There were some

3    claims that we filed that were just outside parking lot

4    violations.  We didn't go into a building.  I don't know

5    if I clarified that very well, but yeah.

6              MR. SPENCER REID:  So in those cases where

7    they're just parking lot signage claims, you don't know

8    whether there was any actual barrier to you getting into

9    the buildings?

10             MS. ALYSSA CARTON:  No.  I hadn't checked

11   anything.  Are you talking about like the handicapped

12   buttons to open the door or --

13             MR. SPENCER REID:  Any of those things.

14             MS. ALYSSA CARTON:  Okay.  Yeah, I don't think

15   we checked any of those.  We just focused on the parking

16   lot, and we felt that that was acceptable at the time.

17   I'm assuming at this point that it probably was not and,

18   you know, it further humiliates a lot of people.  But

19   yeah, that's the direction we took at the time.

20             MR. SPENCER REID:  Thank you.

21             MS. ALYSSA CARTON:  Thank you.

22             MS. ANNA INDAHL:  I have just one small

23   follow-up question.  With businesses that require a code,

24   like a day care center, for example, if it's a keyed

25   entry, did you actually go into those businesses?

```
 1            MS. ALYSSA CARTON:  I don't think we had

 2     access.  You're talking about something like a keyed

 3     entry.  I wouldn't know the code to get in there, so we

 4     didn't -- I don't think we went in there.  I mean, unless

 5     there's an intercom, and I don't know if you're referring

 6     to something, a business like that.

 7            MS. ANNA INDAHL:  I'm asking specifically with

 8     regard to the day care center that you sued, did you go

 9     into that building?

10            MS. ALYSSA CARTON:  I don't have a picture of

11     the building or, you know, the address in front of me, so

12     I wouldn't know which -- like if I went into that

13     building or not.

14            MS. ANNA INDAHL:  Do you recall getting access

15     through an intercom?

16            MS. ALYSSA CARTON:  I don't.

17            MS. ANNA INDAHL:  Okay.  That's all I have.

18            MS. ALYSSA CARTON:  Okay.

19            MS. SHARON POMERANZ:  Can I ask the Court to

20     take judicial notice of the fact that parking violations

21     are defined in the CFR as barriers?  Because they're

22     asking her if she encountered barriers, but it's a legal

23     term.  She's not a lawyer.

24            And any violation on the premise is a barrier

25     under the CFR statute.
```

```
 1                THE COURT:  I understand that's your argument.

 2                MS. SHARON POMERANZ:  I'm just letting her know

 3     that there were barriers.  Parking is a barrier.

 4                THE COURT:  And you're referring to a sign

 5     that's an inch too low is a barrier?

 6                MS. SHARON POMERANZ:  They are all defined as

 7     barriers, architectural barriers in the regulations.

 8     That's how the statute is implemented.

 9                THE COURT:  I understand that's your argument.

10     All right.

11                Mr. Rieder?  Go ahead.

12                MR. GEOFFREY RIEDER:  Good afternoon.  You have

13     alleged in all of your complaints that I've seen, and in

14     pretty much all of them I think it's boilerplate

15     language, that you would patronize and go back to the

16     businesses that you went to as a result of your work with

17     Litigation Management Company.  Do you understand my

18     question?

19                MS. ALYSSA CARTON:  I think I do.  I don't

20     agree with the usage of the word "patronize."  I don't

21     intend to patronize people if they don't want me there.

22     I would not want to go back there.  When I started these

23     cases I intended to, you know, go and participate in, you

24     know, receiving services or, you know, depending on the

25     type of business.
```

```
 1              MR. GEOFFREY RIEDER:  Okay.

 2              MS. ALYSSA CARTON:  And my intentions were

 3      decent at the time, although kind of ill-advised.  And I

 4      guess if you're referring to that part of it, you know,

 5      maybe going back would be patronizing.  But my intent is

 6      not to patronize businesses, so I have an issue with that

 7      language.  I'm sorry.

 8              MR. GEOFFREY RIEDER:  One of the two defendants

 9      that I represent has a business that's located on Lomas

10      and has a transmission shop in it.  Do you remember being

11      at a transmission shop?

12              MS. ALYSSA CARTON:  I think I went to Auto

13      Zone, but I don't know if you're referring to the same

14      business.

15              MR. GEOFFREY RIEDER:  It's an AAMCO auto

16      transmission shop.

17              MS. ALYSSA CARTON:  Yes, I think I do remember

18      going over there.

19              MR. GEOFFREY RIEDER:  And I think I heard you

20      say earlier in the day, but it's getting late, so maybe I

21      didn't --

22              MS. ALYSSA CARTON:  Yeah.

23              MR. GEOFFREY RIEDER:  You don't have a vehicle,

24      do you?  You don't own a car?

25              MS. ALYSSA CARTON:  I used to have a vehicle.
```

```
 1      I don't at this moment.  My goal is to get a vehicle in

 2      the future.  But I think when I was talking about

 3      vehicles earlier, I was talking about new vehicles and

 4      new cars, and I don't have the finances for a new

 5      vehicle.  So I hope that clarifies part of your question.

 6            MR. GEOFFREY RIEDER:  All right.  But as of the

 7      time that the complaint was filed against the person who

 8      has the business where the transmission shop is located,

 9      just to be clear, you didn't own a car?  You didn't have

10      a car?

11            MS. ALYSSA CARTON:  I did not own a car.  I do

12      have friends that own cars, that are disabled, and so I

13      thought for that location, that that was a tester status,

14      but I don't really remember what the filing was.  I

15      apologize.

16            MR. GEOFFREY RIEDER:  Well, and if I represent

17      to you that your complaint against the business that owns

18      the strip shop where that AAMCO transmission shop is

19      located, that you intended to go back to that facility to

20      take advantage of their goods and services, that would be

21      correct, right?

22            MS. ALYSSA CARTON:  That -- I think with that

23      particular business, I probably wouldn't because I don't

24      have a vehicle, so I can't -- I don't have any need for

25      that particular goods and services at this time.
```

1              MR. GEOFFREY RIEDER:  And --

2              MS. ALYSSA CARTON:  But I would later if I

3    bought a car.

4              MR. GEOFFREY RIEDER:  Okay.  And another

5    business I represent is on Eubank.  I think it's 2801 or

6    3801 Eubank.

7              MS. ALYSSA CARTON:  Is it a gas station or -- I

8    don't know what that is.

9              MR. GEOFFREY RIEDER:  Well, no.  Actually, it's

10   a doctor's office.

11             MS. ALYSSA CARTON:  Okay.  Got it.

12             MR. GEOFFREY RIEDER:  It's a doctor who is a

13   child ophthalmologist.  Do you have need of child

14   ophthalmology services in your household?

15             MS. ALYSSA CARTON:  Is it a dental service?

16             MR. GEOFFREY RIEDER:  No, it's eyes,

17   ophthalmologist.

18             MS. ALYSSA CARTON:  I don't know what kind of

19   doctor that is, but I don't have a child, so -- but I

20   have a friend that is disabled, that has a child, and

21   it's possible that I meant to go there as a tester.  So I

22   hope that clarifies.

23             MR. GEOFFREY RIEDER:  Do you have any memory of

24   actually going into the premises?

25             MS. ALYSSA CARTON:  Say that one more time.

1          MR. GEOFFREY RIEDER:  Do you have any memory of

2     actually going into the premises?

3          MS. ALYSSA CARTON:  No, I don't have any

4     memory.  I remember being in the parking lot.  I passed

5     by that place before, but I never went in there.

6          MR. GEOFFREY RIEDER:  All right.  I appreciate

7     that.

8          MS. ALYSSA CARTON:  Thank you.

9          MR. GEOFFREY RIEDER:  You're aware that as a

10    result of the last hearing and your not being in

11    attendance, the Court had asked some questions of your

12    lawyer, and I don't mean to beat a dead horse, but I just

13    want to make sure this is all clear.

14         MS. ALYSSA CARTON:  Thank you.

15         MR. GEOFFREY RIEDER:  Did you ever, when the

16    last hearing was, get on a City bus in order to try to

17    come to these proceedings as the Court had ordered?

18         MS. ALYSSA CARTON:  Are you talking about was

19    my intent in coming here to use the City bus to get here

20    to the hearing?

21         MR. GEOFFREY RIEDER:  Let me ask you the

22    question a little differently.

23         MS. ALYSSA CARTON:  Okay.

24         MR. GEOFFREY RIEDER:  Your lawyer represented

25    to Judge Molzen at the last hearing that she had received

1    a text from you --

2              MS. ALYSSA CARTON:  Yes.

3              MR. GEOFFREY RIEDER:  -- saying that your bus

4    had broken down and you weren't going to be able to get

5    here.

6              MS. ALYSSA CARTON:  Yes.  I exaggerated the

7    truth on that.  I apologize.

8              MR. GEOFFREY RIEDER:  Is that what the text

9    said?

10             MS. ALYSSA CARTON:  The text was basically that

11    the bus had broken down or -- I don't have my phone in

12    front of me.  Something along the lines that the bus had

13    broken down and that it was going to take a while, you

14    know, to get there.  I don't know what I wrote.  I knew

15    it was a lie, and I think that's the important part.  I'm

16    assuming that I exaggerated the truth, and I didn't show

17    up.

18             MR. GEOFFREY RIEDER:  All right.

19             MS. ALYSSA CARTON:  Is that what you're --

20             MR. GEOFFREY RIEDER:  You didn't show up, but

21    the circumstance of it is a little more conflicted than

22    that, simply because I had asked your lawyer to preserve

23    the text that you had sent, and she responded to me.  I

24    sent an e-mail to her --

25             MS. ALYSSA CARTON:  Okay.

1           MR. GEOFFREY RIEDER:  -- which I've got as an

2     exhibit.  If the Court please, I can hand it to the

3     witness.  But the next morning, I got a text back from

4     your lawyer, saying that prior to receiving my e-mail,

5     she had deleted the text that you had sent to her.

6           MS. ALYSSA CARTON:  Right.

7           MR. GEOFFREY RIEDER:  Are you aware of the

8     circumstance?

9           MS. ALYSSA CARTON:  I'm not aware that she

10    deleted it.  I might have deleted it myself.

11          MS. SHARON POMERANZ:  Do you remember I called

12    you?

13          MS. ALYSSA CARTON:  Oh.

14          MS. SHARON POMERANZ:  And asked you if you had

15    your text to provide if the Court needed it?

16          MS. ALYSSA CARTON:  I don't remember that.

17    I'll have to look at my phone and see if I still have it.

18          MS. SHARON POMERANZ:  I did ask her to save it.

19          MR. GEOFFREY RIEDER:  Do you have it here

20    today?

21          MS. ALYSSA CARTON:  Huh?

22          MR. GEOFFREY RIEDER:  Do you have your phone

23    here today?

24          MS. ALYSSA CARTON:  My phone is in my mother's

25    car.

```
 1              MR. GEOFFREY RIEDER:  Okay.  Will you promise
 2     the Court that you will make a search of your texts --
 3              MS. ALYSSA CARTON:  Sure.
 4              MR. GEOFFREY RIEDER:  -- and see if that is
 5     there?
 6              MS. ALYSSA CARTON:  Yes, I will do that.
 7              MR. GEOFFREY RIEDER:  All right.  Now,
 8     actually, the way you had intended to get to the
 9     proceedings wasn't through the bus system at all, was it?
10              MS. ALYSSA CARTON:  No, it was through the bus
11     system.
12              MR. GEOFFREY RIEDER:  Let me try the question a
13     different way.  There is a --
14              MS. ALYSSA CARTON:  Sun Van.
15              MR. GEOFFREY RIEDER:  -- van ride that the City
16     has; is that right?
17              MS. ALYSSA CARTON:  Yes.
18              MR. GEOFFREY RIEDER:  And you had made a --
19              THE COURT:  Everybody needs to talk one at a
20     time, please.
21              MS. ALYSSA CARTON:  Sorry.  Can you repeat
22     that?  I'm so sorry.
23              MR. GEOFFREY RIEDER:  Sure.  So your mode of
24     transportation to come to the proceedings that you missed
25     was not the bus at all, the City bus?
```

1              MS. ALYSSA CARTON:  When I said "the bus," I

2    should have clarified that I meant ABQ Ride, which is a

3    handicapped transit --

4              MR. GEOFFREY RIEDER:  Okay.

5              MS. ALYSSA CARTON:  -- used for people with

6    disabilities.  I didn't clarify that because I didn't

7    understand.  I didn't imagine that it would become this

8    monster.

9              MR. GEOFFREY RIEDER:  All right.

10             MS. ALYSSA CARTON:  So I apologize for not

11   clarifying that when I said "the bus," I meant ABQ Ride,

12   which is a handicapped transit ride system for people

13   with physical disabilities.

14             MR. GEOFFREY RIEDER:  And the records of the

15   van ride program I have before me here, but to cut to the

16   chase, isn't what happened is that the driver showed up

17   at your house too early for you?

18             MS. ALYSSA CARTON:  Yes, they showed up early.

19   I went to sleep that night, and I intended on getting up

20   a little bit earlier than I was able to.  I was dressed

21   in the clothes I had the day before, and by the time they

22   got there, I was just -- I just didn't have a chance to

23   shower and get ready for the day.  They showed up early.

24             I don't know if you all are aware of how Sun

25   Van -- sorry, ABQ Ride; they used to be called Sun Van --

1    how they operate.  You call ahead.  You make a bus

2    reservation.  You have a 15-minute window before your

3    designated ride.  So that means if I were to call and

4    say, "I need a ride to go to court and I need them to

5    pick me up at 8:30," they have the right to show up at

6    8:15.  They also have the right to show up at 8:45 and

7    still be in their allotted time.

8          What they did is, they showed up earlier.  And

9    I'm using this as an example.  I don't know what the time

10   was that I asked for that particular day, but they showed

11   up earlier than I had asked for them to be there, and

12   earlier than their early window, so I was not ready for

13   them to be there.  I needed probably about 20 more

14   minutes for myself to get ready.  And knowing the way

15   that they operate, they're only allowed to give me five

16   more minutes.

17         So what happened was, I said, "You can go ahead

18   and go, I'm not ready, and I'll just have to deal with

19   the consequences."  So I shooed them away.  I was tired.

20   I went back to sleep for a few minutes, and thought, oh,

21   crud, I need to talk to my lawyer.  And I just -- I had

22   assumed that, you know, she would be able to handle it.

23   You know, I had heard somewhere that, you know, if I

24   didn't show up, it might be possible for them -- for

25   things to just move along without me.  It was probably

1    ill-advised.

2              But that wasn't my intent, to skip, you know,

3    being here, but I just thought, well, I'm not able to

4    make it now because I'm not ready.  So I just tried to

5    relax and figure out, you know, what do I do now.  So --

6              MR. GEOFFREY RIEDER:  And so what you did now

7    was go back to sleep?

8              MS. ALYSSA CARTON:  I went and kind of relaxed

9    a little bit, and then I decided to call my lawyer and

10   say, "Hey, I'm not able to make it."  And I probably

11   could have -- I debated whether to call my family or not,

12   because usually my family is either, you know, getting

13   ready for their day or, you know, they're still asleep or

14   whatever, depending on the person.  And I just at that

15   point in time, I just didn't know what to do about it.  I

16   didn't feel -- I didn't feel like I needed to worry about

17   it, because I did the best I could --

18             MR. GEOFFREY RIEDER:  Okay.

19             MS. ALYSSA CARTON:  -- to make a bus

20   reservation.

21             MR. GEOFFREY RIEDER:  Did you come on the van

22   this morning?

23             MS. ALYSSA CARTON:  My mother brought me here.

24             MR. GEOFFREY RIEDER:  And she's here in the

25   courtroom?

```
 1            MS. ALYSSA CARTON:  She is here in the
 2    courtroom.
 3            MR. GEOFFREY RIEDER:  And it occurred to you,
 4    when you realized that something got twisted around in
 5    terms of the van ride --
 6            MS. ALYSSA CARTON:  Yes.
 7            MR. GEOFFREY RIEDER:  -- that one of the people
 8    you would have thought to call probably would be your
 9    mom, I suppose?
10            MS. ALYSSA CARTON:  Well, I assumed, like I
11    said earlier, that she might have been asleep.  I mean, I
12    don't -- you know, she and I discussed that and, you
13    know, I regret not calling her, you know.
14            MR. GEOFFREY RIEDER:  You realize that the
15    hearing was set for 10:00, the same as today's hearing?
16            MS. ALYSSA CARTON:  Yes.  I don't know -- I
17    didn't explain -- with Sun Van, the way that that works
18    is that they take an hour to get from my house to
19    whatever location they're scheduled to go to, because
20    they've got other people on the ride, on the bus.
21            Now, maybe what you're inferring is that I had
22    a whole hour to call my mother and say, "I need help
23    getting to court."
24            MR. GEOFFREY RIEDER:  Let's --
25            MS. ALYSSA CARTON:  I should have.  I should
```

1    have done that.

2              MR. GEOFFREY RIEDER:  That was an alternative

3    and, yes, it's something that you should have considered

4    doing.

5              MS. ALYSSA CARTON:  Yes, I should have.

6              MR. GEOFFREY RIEDER:  But did you know that the

7    scheduled pickup for you was supposed to be at 9:12?

8              MS. ALYSSA CARTON:  I asked for -- wait a

9    minute.  I remember scheduling a 9:00, and maybe it was a

10   -- no, it was an 8:45.  I scheduled an 8:45.  And

11   sometimes it happens, it occurs that, you know, you call

12   and you make a bus reservation, and you've got a

13   situation where somebody doesn't document the correct

14   time or whatever.  You know, they're talking to somebody

15   else and they're in their office or -- I don't know.  I

16   don't know.

17             I don't understand the relevance at this point.

18   I've apologized.

19             MR. GEOFFREY RIEDER:  Yeah.  Be that as it may,

20   the driver apparently, according to the records of the

21   City, was in your driveway at your home at 8:29.  Does

22   that ring a bell with you?

23             MS. ALYSSA CARTON:  Yes.  And they were early.

24   That's what my point is.  They were early, and I wasn't

25   ready, and I shooed them away.

1    MR. GEOFFREY RIEDER:  All right.  And do you

2    remember, before you shooed him away, that the driver

3    told you that he could wait for you?

4              MS. ALYSSA CARTON:  Yes.

5              MR. GEOFFREY RIEDER:  Okay.

6              MS. ALYSSA CARTON:  And all he was able to wait

7    for me was five minutes.  I know the drill.  That's how

8    it works.  Five minutes.

9              MR. GEOFFREY RIEDER:  He said that to you on

10   this occasion, "I can only wait five minutes"?

11             MS. ALYSSA CARTON:  He did not say that.  That

12   is, he said -- well, actually, I had met him the day

13   before on a different ride.  He was a new employee, so he

14   does not understand how ABQ Ride works.  I've been a

15   rider of ABQ Ride since I was 13.  I am 39.  So that is

16   how they operate, and I knew that's how that was going to

17   play out, so I had no problem shooing him away and

18   saying, "I'm not able to make it.  You can go ahead and

19   go."

20             MR. GEOFFREY RIEDER:  So if the record from the

21   City indicates that the new driver, which he was a new

22   driver --

23             MS. ALYSSA CARTON:  Yes.

24             MR. GEOFFREY RIEDER:  -- says, "He offered to

25   wait, and she told him that she wasn't going today" --

1    and this is at 8:29.

2              MS. ALYSSA CARTON:  I didn't say those words

3    directly to him.  I did not say, "I'm not going today" --

4              MR. GEOFFREY RIEDER:  All right.

5              MS. ALYSSA CARTON:  -- when I was referring and

6    talking to him.  Those were not my words.  Those were his

7    words.

8              MR. GEOFFREY RIEDER:  All right.  Did your

9    lawyer communicate to you the consequence and the chaos

10   that was as a result of you not being here a week ago

11   when the Court ordered you to be?

12             MS. ALYSSA CARTON:  I don't know if she

13   communicated all of it, but I assumed that the

14   consequences, and I had to come back and apologize to the

15   Court and everybody who was involved and, you know, show

16   up, be here and testify.  I don't know if there's

17   anything else.  Is there?

18             MR. GEOFFREY RIEDER:  Is there anything else?

19             MS. ALYSSA CARTON:  Is there any other

20   consequence?

21             MR. GEOFFREY RIEDER:  That's up to the Judge.

22             MS. ALYSSA CARTON:  Okay.  And I'm willing to

23   accept that.  I'm just saying, I don't know if there's

24   anything else.  I understand that there could be at this

25   point in time, and I respect the Judge's decision on that

```
 1    matter.
 2              MR. GEOFFREY RIEDER:  Let me go back to the
 3    confidential agreement that has been mentioned here a few
 4    times.  You testified earlier that you may have e-mailed
 5    somebody that document.  Do you recall that testimony?
 6              MS. ALYSSA CARTON:  Yes.
 7              MR. GEOFFREY RIEDER:  As a matter of fact,
 8    didn't you e-mail that to a reporter over in Phoenix who
 9    was doing a report about all these things?
10              MS. ALYSSA CARTON:  I'm assuming, since you
11    brought up Phoenix, I probably did.
12              MR. GEOFFREY RIEDER:  Okay.  That's all I have,
13    Your Honor.
14              THE COURT:  All right.  Any other questions?
15    No?  All right.
16              Ms. Pomeranz, were you associated with
17    Litigation Management Services before Ms. Carton came to
18    you, seeking your services?
19              MS. SHARON POMERANZ:  I had answered their ad
20    prior to meeting Ms. Carton, yes, but I didn't sign my
21    agreements with them until after meeting Ms. Carton.  But
22    I had been in discussions with them about the work prior.
23              THE COURT:  All right.  I'm going to order that
24    both you and Ms. Carton provide me with copies of those
25    agreements that you have --
```

144

```
1              MS. SHARON POMERANZ:  Yes, Your Honor.
2              THE COURT:  -- with Litigation Management
3    Services.  I'll look at it, and then based upon the
4    testimony here today, I will see whether or not they
5    should be made available to others; and if so, if that
6    should be pursuant to any kind of confidentiality
7    agreement.
8              There's a chance that it will be produced by
9    court order.  That should alleviate any concerns you may
10   have with being in breach of that contract.
11             MS. SHARON POMERANZ:  Thank you, Judge.
12             THE COURT:  I'm kind of at a loss of how to
13   proceed at this point.
14             MS. SHARON POMERANZ:  I would like to say that
15   after the last hearing, I did get some calls from people
16   expressing upset about the situation, but we did get some
17   calls from people who are disabled, thanking Ms. Carton
18   for her courageousness, so I'd like her to know that and,
19   you know, let everybody here know that even though Ms.
20   Carton is now seeking to dismiss these cases, she did
21   make a difference because she did remediate some
22   violations.  And so whatever happens with the rest of the
23   businesses in Albuquerque, whether -- the important part
24   is that she has raised awareness and has remedied
25   violations, and I thank her for that.
```

```
 1                THE COURT:  I have no doubt, Ms. Carton, that

 2      you intended to help to remediate.  That's the purpose

 3      behind the ADA.  However, I agree with you, Ms. Carton,

 4      that this has caused bad feelings among the business

 5      community.

 6                MS. ALYSSA CARTON:  Yeah.  Yes.

 7                THE COURT:  It has actually backfired, and it

 8      would have been much preferable, had your attorney and

 9      this group that you looked at or worked with given more

10      thought --

11                MS. ALYSSA CARTON:  Yes.

12                THE COURT:  -- to the consequences of this

13      rapid fire.  I want to talk to you about this case called

14      Molski v. Mandarin Touch Restaurant, and I discussed it.

15      I'm just going to read to you what this judge said --

16                MS. ALYSSA CARTON:  Okay.

17                THE COURT:  -- in a similar case.

18                MS. ALYSSA CARTON:  Was this --

19                THE COURT:  2004.

20                MS. ALYSSA CARTON:  Okay.  So this isn't one of

21      my cases?

22                THE COURT:  No, not at all.

23                MS. ALYSSA CARTON:  I'm like, I don't recognize

24      this restaurant.  I'm paranoid now.

25                THE COURT:  No, it's a lawsuit out of the
```

1    Central District of California.

2            MS. ALYSSA CARTON:  Okay.  Thank you.

3            THE COURT:  It's in Federal Court, and it's

4    actually a long while ago, 2004.

5            MS. ALYSSA CARTON:  Okay.

6            THE COURT:  This judge -- and I don't have his

7    name or her name right now.

8            It says, "The ability to profit from ADA

9    litigation has given birth to what one Court described as

10   'a cottage industry.'"

11           And I'm going to omit the citations and the

12   references in this, just to give you the content.

13           MS. ALYSSA CARTON:  Thank you.

14           THE COURT:  "The scheme is simple:  An

15   unscrupulous law firm sends a disabled individual to as

16   many businesses as possible, in order to have him

17   aggressively seek out any and all violations of the ADA.

18   Then, rather than simply informing a business of the

19   violations, and attempting to remedy the matter through

20   'conciliation and voluntary compliance,' a lawsuit is

21   filed, requesting damage awards that would put many of

22   the targeted establishments out of business.  Faced with

23   the specter of costly litigation and a potentially fatal

24   judgment against them, most businesses quickly settle the

25   matter.  The result of this scheme is that 'the means for

1    enforcing the ADA (attorney's fees) have become more

2    important and desirable than the end (accessibility for

3    disabled individuals).'  Serial plaintiffs, like" -- in

4    that case, Mr. Molski -- "serve as 'professional pawns in

5    an ongoing scheme to bilk attorneys' fees.'  It is 'a

6    type of shotgun litigation that undermines both the

7    spirit and the purpose of the ADA.'"

8             It looks to me like you were such a pawn.

9             MS. ALYSSA CARTON:  Yeah.

10            THE COURT:  And I will be looking at that as I

11   proceed in formulating what my recommendations will be to

12   Chief Judge Armijo.

13            MS. ALYSSA CARTON:  Thank you, Your Honor.

14            THE COURT:  I may be asking for briefing on

15   certain issues.  I don't want every single defendant to

16   have to add in on this briefing, but I think there are a

17   couple of issues that I do have, once I review the

18   transcript from today; and, again, the potential issue of

19   sanctions.

20            Jeff, do you have anything else you want me to

21   ask?

22            LAW CLERK JEFFRIE MINIER:  No.

23            THE COURT:  All right.  With that, I should

24   know how I'm going to proceed within the next week.

25            I'll expect those agreements by close of

1      business tomorrow.

2              MS. SHARON POMERANZ:  Absolutely, Judge.

3              THE COURT:  All right.

4              And thank you for bringing your daughter today.

5      It's much appreciated.

6              MRS. RUE CARTON:  Yes.

7              THE COURT:  And we'll be in recess.

8              LAW CLERK JEFFRIE MINIER:  All rise.

9              (Proceedings concluded at 12:53 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
FEDERAL OFFICIAL COURT REPORTER
333 Lomas Boulevard, Northwest
Albuquerque, New Mexico  87102

1    UNITED STATES OF AMERICA

2    DISTRICT OF NEW MEXICO

3

4                      CERTIFICATE OF OFFICIAL REPORTER

5                      I, Julie Goehl, RDR, CRR, RPR, RMR,

6    New Mexico CCR #95, Federal Official Realtime Court

7    Reporter, in and for the United States District Court

8    for the District of New Mexico, do hereby certify that

9    pursuant to Section 753, Title 28, United States Code,

10   that the foregoing is a true and correct transcript of

11   the stenographically reported proceedings held in the

12   above-entitled matter and that the transcript page

13   format is in conformance with the regulations of the

14   Judicial Conference of the United States.

15                      Dated this 16th day of May, 2017.

16

17                      _____

18                      JULIE GOEHL
                         FEDERAL OFFICIAL COURT REPORTER
                         Registered Diplomate Reporter
19                      Registered Professional Reporter
                         Registered Merit Reporter
20                      Certified Realtime Reporter
                         NM Certified Court Reporter #95
21                      333 Lomas Boulevard, Northwest
                         Albuquerque, New Mexico  87102
22                      Phone:  (505)348-2209
                         Fax:    (505)348-2215
23                      Email:  Julie_Goehl@nmcourt.fed.us

24

25